MYRTLE BEACH PIPELINE CORPO-RATION and Davidson Pipeline Corporation d/b/a Myrtle Beach Pipeline Company, Standard Southern Corporation, and Reliance Insurance Company, and Allianz, Plaintiffs,

v.

EMERSON ELECTRIC COMPANY, Defendant.

No. 3:86–1796–21.

United States District Court,
D. South Carolina,
Columbia Division.

Dec. 8, 1993.

Harry L. Goldberg, Gerald Michael Finkel, Howard S. Sheftman, Columbia, SC, William Jefferson Leath, Jr., Charleston, SC, Roger E. Marken, Los Angeles, CA, for plaintiffs.

Charles Edward Hill, Columbia, SC, Francis H. Brown, III, George A. Frilot, III, New Orleans, LA, for defendant.

## ORDER

TRAXLER, District Judge.

### I. INTRODUCTION

This action is before the court on the parties' cross-motions for partial summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. In their second amended complaint, Plaintiffs, a conglomeration of corporations and their insurers, (collectively, "Myrtle Beach"), assert claims of common law negligence and breach of implied warranty of merchantability pursuant to the Uniform Commercial Code as adopted in South Carolina, see S.C.Code Ann. §§ 36–1–101 to 36–10–103 (Law.Co-op.1976 & Supp. 1992), against Defendant Emerson Electric Company ("Emerson"), contending that Emerson is liable to Myrtle Beach for damages resulting from injury to property owned by the United States. Conversely, Emerson asserts that Myrtle Beach cannot proceed on its common law negligence claim because this action is grounded solely in contract and therefore Myrtle Beach is relegated to the limited remedies embodied in the contract between the parties. Concluding that under South Carolina law Myrtle Beach's negligence claim cannot be maintained and that the limited remedy of repair and replacement is the sole remedy to which Myrtle Beach is entitled under the breach of implied warranty, this court grants Emerson's motion for partial summary judgment and denies Myrtle Beach's motion for partial summary judgment.

### II. THE FACTS

Myrtle Beach, a corporation with its headquarters in Houston, Texas, but transacting business in South Carolina, supplied and stored fuel for the United States Air Force at Myrtle Beach Air Force Base ("Base"), property owned by the United States. In 1979, Myrtle Beach and one of its principals, Standard Southern Corporation ("Standard"), also a Texas corporation, contracted with the United States to install a fuel metering system to link storage tanks of Myrtle Beach and the Government. Pursuant to this agreement, Myrtle Beach and Standard hired Gonzalo Ancira ("Ancira") to design the metering system. Concluding that the metering system should incorporate an air eliminator, Ancira solicited several bids for the production of such a mechanism and recommended that the air eliminator manufactured by Brooks Instrument Division of Emerson Electric Company ("Brooks") be incorporated into the metering system. Like Myrtle Beach and Standard, Brooks and Emerson are also Texas corporations.

Brooks's bid quoted a price of $1,145.00 for the cost of the air eliminator. Additionally, the quotation contained the following disclaimer:

WARRANTY: All Brooks products (other than resale, custom and electro-mechanical equipment not manufactured by Brooks), when operated under the conditions stipulated by Brooks in the operating manual for the product are warranted against defect in workmanship and materials for one year from date of shipment and to conform to the written specifications. This constitutes Brooks' only warranty in connection with this sale and is in lieu of all other warranties, expressed or implied, written or oral. THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILI-

TY OR FITNESS FOR A PARTICULAR PURPOSE THAT APPLY TO THIS SALE. No employee, agent, dealer or other person is authorized to give any warranties on behalf of Brooks, nor to assume for Brooks any other liability in connection with any of its products without prior written approval by an officer of Brooks. Limitation of Remedy: Brooks will repair or replace at Brooks' option, F.O.B. factory, any Brooks parts defective in workmanship or materials if such part is returned, freight prepaid, within one year from date of shipment to the nearest factory authorized service station or to the factory. It is agreed that such replacement or repair is the exclusive remedy available from Brooks should any of Brooks products prove defective. Brooks is not liable for damages of any sort, including incidental and consequential damages.

The quotation supplied by Brooks therefore explicitly disclaimed any implied warranties, limited Myrtle Beach to a remedy of repair or replacement, and excluded incidental and consequential damages. These warranty provisions appeared on the reverse side of page one on the two-page quotation. Ancira forwarded this quotation to Standard, writing "[p]lease place purchase order with Brooks Instrument Division as quoted." In turn, Standard wrote to Brooks, attached a copy of Brooks's quotation, which included the provisions previously recited, and requested that Brooks "[p]lease ship the [air eliminator] ... [a]s per your quotation." Brooks complied and shipped the air eliminator to South Carolina, where it was installed by Myrtle Beach in 1980. These transactions were negotiated in Texas.

On January 15, 1981, approximately ten months after installation, the air eliminator ruptured and roughly 123,000 gallons of fuel spilled on Base premises. The United States, concluding that Myrtle Beach was responsible for the spill, requested that it be reimbursed for the loss of the fuel. Myrtle Beach initially denied liability and refused reimbursement, but the dispute was subsequently settled on Myrtle Beach's payment

of $80,000 to the Government for the fuel. Myrtle Beach incurred $23,000.00 in attorneys' fees and expenses in this litigation. Greater than the costs of the spilled fuel, however, and the principal damages sought by Myrtle Beach, are the costs incurred by Myrtle Beach in cleaning up the spill at the Government's order.

Faced with high clean up costs, Myrtle Beach filed a complaint in the District of South Carolina in June of 1986.[1] In its original complaint, Myrtle Beach, contending that South Carolina law applies to this action, alleged four claims: (1) strict liability in tort; (2) violation of the South Carolina Unfair Trade Practices Act, see S.C.Code Ann. §§ 39–5–10 to 39–5–160 (Law.Co-op.1976); (3) breach of implied warranty; and (4) negligence. Emerson, asserting that Texas law governed disposition of this action, moved for partial summary judgment with respect to all of Myrtle Beach's claims. Another district judge to whom this case was originally assigned granted Emerson's motion with respect to the strict liability and unfair trade practices claims in 1988. The prior district judge, however, without comment, denied Emerson's motion regarding the breach of implied warranty of merchantability and negligence claims. In its second amended complaint before this court, the only claims are for breach of implied warranty of merchantability and negligence. Despite the prior ruling, all parties have resubmitted the issues to this court. Because of developments in the law, this court finds reviewing these issues appropriate. Accordingly, at the behest of the parties, this court considers the claims against Emerson for breach of implied warranty and negligence. The court commences its disposition by determining what law governs this action.

### III. *CHOICE OF LAW*

The threshold issue facing the court is determining the applicable law. Myrtle Beach contends that South Carolina law applies with respect to the alleged negligence claim because the alleged injury occurred in this forum; likewise, Myrtle Beach contends

1. While this action was originally commenced before another district judge in June of 1986, it was transferred to my chambers as part of my beginning caseload in April of 1992.

that South Carolina law applies to the breach of implied warranty claim under South Carolina's choice of law provision pursuant to the South Carolina Uniform Commercial Code. Conversely, Emerson asserts that Texas law governs the disposition of the breach of implied warranty claim pursuant to the Texas Uniform Commercial Code and that the statute of limitations has expired on this claim thereby barring it.[2] Pursuant to *Erie Railroad v. Tompkins,* 304 U.S. 64, 78–79, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938), a federal court exercising diversity jurisdiction, as here, must apply the substantive law of the forum state in which it sits. Extrapolating from *Erie,* the Supreme Court held in *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941), that choice of law is a substantive matter, and therefore federal courts sitting in diversity must apply the choice of law rule of the forum state, here, South Carolina. With these propositions in mind, the court addresses the choice of law rule with respect to each claim.

### A. *The Tort Claim*

■ South Carolina law provides that the substantive law governing a tort action is determined by the state in which the injury occurred, commonly referred to as the *lex loci delicti* rule. *See Algie v. Algie,* 261 S.C. 103, 198 S.E.2d 529, 530 (1973); *Oshiek v. Oshiek,* 244 S.C. 249, 136 S.E.2d 303, 305 (1964). Under the *lex loci delicti* rule, this court must apply the substantive law of South Carolina because the alleged injury occurred here. Accordingly, because South Carolina is the situs of the injury, the law of South Carolina applies to Myrtle Beach's alleged negligence claim.

### B. *The Contract Claim*

■ Myrtle Beach's breach of implied warranty claim is asserted pursuant to S.C.Code Ann. § 36–2–314 of the South Carolina Uniform Commercial Code, S.C.Code Ann. §§ 36–1–101 to 36–10–103 (Law.Co-op. 1976) ("Uniform Commercial Code"). The Uniform Commercial Code provides for choice of law:

> Except as provided hereafter in this section, when a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of such other state or nation shall govern their rights and duties. Failing such agreement this act applies to transactions bearing an appropriate relation to this State.

S.C.Code Ann. § 36–1–105(1). Under this choice of law provision, the law of South Carolina applies provided that the transactions between the parties bear an "appropriate relation" to the forum state; and the parties have not, as here, provided for choice of law. Unfortunately, what constitutes an "appropriate relation" is not defined in subsection 36–1–105(1); and the courts of South Carolina have not construed or interpreted the term with respect to South Carolina choice of law rules.[3] The Fourth Circuit, however, has concluded that the "appropriate relation" test mirrors the "most significant relationship" test of conflicts of laws analysis, which holds that "the law of the state with the 'most significant relationship' to the matter at issue is applied." *Compliance Marine, Inc. v. Campbell (In re Merritt Dredging),* 839 F.2d 203, 206–07 (4th Cir.), *cert. denied,* 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988). The *Merritt Dredging* court therefore defined "appropriate relation" in terms of whether the forum state had a significant interest in resolving the disputed issue. *Id.* Apart from binding precedent, this court notes that the South Carolina Reporter's Comments to subsection 36–1–105(1) state that "the forum state shall apply its law if it has a reasonable relationship with the contract." Accordingly, this court must determine whether South Carolina has a suffi-

---

2. Emerson avers that Myrtle Beach cannot maintain a negligence action, *see infra* at 1048, and consequently does not advance a choice of law provision with respect to this claim.

3. In *McLean v. Godwin Properties, Inc.,* 294 S.C. 128, 363 S.E.2d 108, 110 (1987), the Court of Appeals of South Carolina cited § 36–1–105(1) in holding that Florida law governed the transaction because the instrument clearly provided for such. The *Osborn* court therefore did not construe this section regarding South Carolina law.

ciently "significant interest" justifying application of the forum's law.

■ Under the facts of this case, the court concludes that South Carolina law should be applied. First, while the negotiations occurred in Texas, the injury was sustained in South Carolina; thus, the injury occurred in the forum. This occurrence strongly favors application of South Carolina law. Second, Myrtle Beach transacts business in South Carolina; therefore, a party with contacts in South Carolina is bringing this action in the forum. Again, this favors application of the forum's law. Finally, the air eliminator was shipped to South Carolina and installed by Myrtle Beach in South Carolina; hence, the part was finally attached in the forum. The court concludes that these reasons compel application of South Carolina law to the breach of implied warranty of merchantability claim. *See generally Thornton v. Cessna Aircraft Co.,* 703 F.Supp. 1228, 1234 (D.S.C. 1988) (holding that because decedent was a resident of South Carolina, purchased the defective product in South Carolina, and maintained the defective product in South Carolina, subsection 36–1–105(1) compelled that South Carolina law should be applied because South Carolina had an appropriate relation to the action), *aff'd,* 886 F.2d 85 (4th Cir.1989).[4]

## IV. *THE SUMMARY JUDGMENT STANDARD*

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, the Rule requires that the court enter judgment against a party who, "after adequate time for . . . discovery fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party seeking summary judgment shoulders the initial burden of demonstrating that there is no genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. Accordingly, to prevail on a summary judgment motion, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. A fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if the evidence so offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257, 106 S.Ct. at 2515. In determining whether a genuine issue has been raised, the court must construe all inferences against the movant and in favor of the non-movant. *Id.* at 257–58, 106 S.Ct. at 2514–15. On a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Heyman v. Commerce & Indus. Ins.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). The non-movant, however, "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Rather, if the evidence "is so one-sided that one party must prevail as a matter of law," the court must enter summary judgment. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. Hence, the non-movant, to survive the motion, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553.

---

**4.** This court concludes later in this opinion that under South Carolina law, Myrtle Beach cannot succeed on its contract claim. *See infra,* at 1035–48. Even if Texas law were applied, Myrtle Beach's contract claim would still fail because the Texas statute of limitations expired before commencement of this suit. Under Texas law,

such a cause of action must be brought within four years after it accrues. *See generally* Tex. Bus. & Com.Code Ann. §§ 2.314 (collecting cases), 2.725(a) (West 1993). Myrtle Beach, in its brief, has not contested the existence or effect of the Texas limitations period, but has instead asserted that Texas law does not apply.

Summary judgment serves the useful purpose of disposing of meretricious, pretended claims before the court and parties become "entrenched in a frivolous and costly trial." *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). The courts, therefore, should not be reluctant to grant summary judgment in appropriate cases; indeed, summary judgment is mandated where appropriate. *See, e.g., Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir. 1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *United States v. Porter,* 581 F.2d 698, 703 (8th Cir.1978); *Estate of Detwiler v. Offenbecher,* 728 F.Supp. 103, 104 (S.D.N.Y.1989); *Burleson v. Illinois Farmers Ins. Co.,* 725 F.Supp. 1489, 1490 (S.D.Ind.1989). In a recent trilogy of decisions—*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)—the Supreme Court has consistently reaffirmed its endorsement of pretrial resolution and summary disposition. These decisions reflect the mandatory nature of Rule 56. In *Celotex Corp.,* the Court stated:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual bases.

*Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555 (citations and internal quotation marks omitted). The law therefore compels that

summary judgment be entered if the complainant's action cannot be maintained. Against this procedural standard, the court examines the merits.

## V.  *THE MERITS*

Before addressing the merits, this court makes some general, yet crucial, observations concerning this action. Undisputedly, both Myrtle Beach and Emerson are sophisticated commercial entities that enjoy relatively equal bargaining power. The impetus giving rise to this suit is a commercial transaction governed by the law of contracts as codified by the Uniform Commercial Code. Stripped to its essentials, therefore, this a contract action executed in a commercial setting between two merchants that bargained for a particular product. In this context, this court examines Myrtle Beach's claims.

Myrtle Beach attempts to assert both a breach of implied warranty of merchantability claim and a tort claim against Emerson, contending that the contract claim does not preclude the tort claim. Emerson counters that this case is solely governed by the law of contract and that no tort claim lies. The court addresses Myrtle Beach's claims separately.

### A.  *The Contract Claim*

The Uniform Commercial Code provides for both express and implied warranties. *See* S.C.Code Ann. §§ 36–2–313 to 36–2–315. The Uniform Commercial Code, however, also provides that parties may exclude or modify, or both, the implied warranties of merchantability or fitness for a particular purpose subject to certain conditions, *see* S.C.Code Ann. § 36–2–316(2), (3), but that express warranties may not be disclaimed, *see* § 36–2–316(1). The court therefore must first determine the type of warranties, if any, that were created in this transaction and then determine if any implied warranties were properly excluded.[5]

---

**5.** With respect to express warranties, the Uniform Commercial Code provides:

> (1) Express warranties by the seller are created as follows:

> (2) Any affirmation of fact or promise, including those on containers or labels, made by the seller to the buyer, whether directly or indirectly, which relates to the goods and becomes part of the basis of the bargain creates

### 1. *Implied Warranty*

#### a. *Creation*

■ Implied warranties are created and disclaimed pursuant to the Uniform Commercial Code. *See generally* §§ 36–2–313 to 36–2–318. For example, a warranty of merchantability is implied in a contract for the sale of goods if the vendor is a merchant with respect to goods of that type. *See* § 36–2–314. Similarly, an implied warranty of fitness for a particular purpose arises if the vendor knows when the contract is formed that the purchaser is relying on the vendor's skill or judgment in furnishing the goods. *See* § 36–2–315. Both of these implied warranties may be disclaimed. *See* § 36–2–316. Because the implied warranty of merchantability arose in this case, the court must now determine whether it was properly disclaimed.[6] This inquiry requires that the court determine whether the disclaimer was express or implied. The express disclaimer of implied warranties provision of the Uniform Commercial Code provides:

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude the implied warranty of merchantability or of fitness for a particular purpose must be specific, and if the inclusion of such language creates an ambiguity in the contract as a whole it shall be resolved against the seller.

S.C.Code Ann. § 36–2–316(2). Apart from providing the express method for disclaiming implied warranties, the Uniform Commercial Code also provides for alternative methods for disclaiming implied warranties:

(3) Notwithstanding subsection (2)

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by specific language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or, between merchants, by usage of trade.

S.C.Code Ann. § 36–2–316(3)(a)–(c). Here, the disclaimer is express because it is embodied in the contract between the parties. The various alternative methods for disclaiming implied warranties found in subsection 36–2–316(3) simply do not apply. Rather, the rights and remedies of the parties are expressly articulated in their written contract. Because here the parties are bound by a written instrument, subsection 36–2–316(2) applies to Myrtle Beach's breach of warranty of merchantability claim.[7]

---

an express warranty that the goods conform to the affirmation or promise.
S.C.Code Ann. § 36–2–313(1)(a). In the quotation provided to Myrtle Beach, Emerson agreed that its products "when operated under the conditions stipulated by Brooks ... are warranted against defects in workmanship and materials ... and to conform to the written specifications." Myrtle Beach, however, has not pled or argued a breach of express warranty pursuant to this section. Consequently, the court does not address the possibility of a breach of express warranty claim.

**6.** None of the parties raised the issue of implied warranty of fitness for a particular purpose. Indeed, Myrtle Beach did not plead this claim in its complaint, nor has it argued this claim in its

brief; rather, it has confined itself to the breach of implied warranty of merchantability. Consequently, the court does not address the issue of fitness for a particular purpose. Even if, however, the issue of fitness for a particular purpose were raised, the court concludes that the claim would not succeed for the reasons that the breach of implied warranty of merchantability failed.

**7.** The court concludes that Myrtle Beach's assertion, based on Official Comment 8 and the South Carolina Reporter's Comments, that there can be no disclaimer of implied warranties with respect to latent defects is misplaced. The commentary applies only to § 36–2–316(3), exclusions arising by implication, not to § 36–2–316(2), explicit ex-

### b. *Effectiveness of Disclaimer*

Concluding that the express disclaimer provision of subsection 36–2–316(2) applies further narrows the issue to determining whether Emerson properly disclaimed any implied warranties as prescribed by the statute. To exclude the implied warranty of merchantability, subsection 36–3–316(2) requires that the disclaiming language "mention merchantability," be "conspicuous," and be "specific." The statute further provides that any ambiguity in the purported disclaimer is to be construed against the seller. Of subsection 36–2–316(2)'s three requirements, the Uniform Commercial Code only defines "conspicuous:"

> A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals ... is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color.... Whether a term or clause is "conspicuous" or not is for decision by the court.

S.C.Code Ann. § 36–1–201(10). The instant disclaimer must be examined in light of these requirements.

Disclaimers in written instruments pursuant to subsection 36–2–316(2) are valid contractual provisions because they are expressly provided for by the Uniform Commercial Code and are to be enforced when agreed upon because "courts are compelled to give effect to the intent of the parties." *Valtrol, Inc. v. General Connectors Corp.*, 884 F.2d 149, 152 (4th Cir.1989) (sustaining disclaimer as valid). Accordingly, the instant disclaimer will be upheld if it satisfies the criteria of subsection 36–2–316(2).

In *Investors Premium Corp. v. Burroughs Corp.*, 389 F.Supp. 39 (D.S.C.1974), two commercial entities disputed the validity of a disclaimer clause strikingly similar to the present disclaimer:

> THERE ARE NO UNDERSTANDINGS, AGREEMENTS, REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED (INCLUDING ANY REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE) NOT SPECIFIED HEREIN, RESPECTING THIS CONTRACT OR THE EQUIPMENT HEREUNDER. THIS CONTRACT STATES THE ENTIRE OBLIGATION OF SELLER IN CONNECTION WITH THIS TRANSACTION.

*Id.* at 45. The court sustained the disclaimer because "the exclusionary language is set out in a separate paragraph in large contrasting type—being in ALL CAPITAL LETTERS." *Id.* at 45. Likewise, in *Childers & Venters, Inc. v. Sowards*, 460 S.W.2d 343 (Ky.1970), the court enforced a disclaimer of implied warranties against a consumer by a corporate entity, even though the disclaiming language was on the reverse side of the contract, because the clause was printed in larger, darker print than the remainder of the instrument. *Id.* at 344–45. *See also Jaskey Finance & Leasing v. Display Data Corp.*, 564 F.Supp. 160, 165 (E.D.Pa.1983) (holding that disclaimers printed in distinguished type were not rendered inconspicuous because they were located "on the reverse side of the contracts"). In *Walter E. Heller & Co. v. Convalescent Home of First Church of Deliverance*, 49 Ill.App.3d 213, 8 Ill.Dec. 823, 365 N.E.2d 1285 (1977), the court enforced a disclaimer of implied warranties even though the disclaimer fell under the heading "Warranties." *Id.*, 8 Ill.Dec. at 828, 365 N.E.2d at 1290. The court concluded that the disclaimer was effective because it was printed in large type and the contract was only two pages in length. *Id.* In *South Carolina Electric & Gas Co. v. Combustion Engineering, Inc.*, 283 S.C. 182, 322 S.E.2d 453 (Ct. App.1984), however, the court refused to enforce a purported disclaimer of implied warranties because the disclaiming language not only failed to mention merchantability as the statute requires, but also because the disclaiming language was on page 17 of a twenty-two–page, "mostly single-spaced" instrument and was "indistinctive both as to color and as to type." *Id.*, 322 S.E.2d at 456. Similarly, in *Cooley v. Salopian Industries*, 383 F.Supp. 1114 (D.S.C.1974), the court concluded that a purported disclaimer was inef-

clusions pursuant to a written instrument. The

text of the opinion also demonstrates this point.

fective because it was "buried" in a lengthy document and was "not in larger or other contrasting type or color." *Id.* at 1118 (citation and internal quotation marks omitted).

The status of the parties is material in resolving the issue of whether language is conspicuous. For example, in *American Electric Power Co. v. Westinghouse Electric Corp.,* 418 F.Supp. 435 (S.D.N.Y.1976), the court enforced a clause disclaiming implied warranties, with little reference to location, size, or color of print. After observing that the Uniform Commercial Code expressly provides for disclaimers, the court succinctly stated: "It strains credulity to suggest that plaintiffs had no notice or were unaware of the exclusion of implied warranties in the ... contract." *Id.* at 451 n. 22. Similarly, the court in *AMF, Inc. v. Computer Automation, Inc.,* 573 F.Supp. 924 (S.D.Ohio 1983), also noted that the "trend" in determining whether a disclaimer is conspicuous "is to determine if the bargaining strength and commercial sophistication of the parties made it reasonable that the limiting language was brought to the attention of the parties." *Id.* at 929. *See also Avenell v. Westinghouse Elec. Corp.,* 41 Ohio App.2d 150, 70 O.O.2d 316, 324 N.E.2d 583, 586–87 (1974) (holding that disclaimer was conspicuous among other reasons because the purchaser was a "prominent, sophisticated entity"). Thus, the court must consider the status of the parties to the transaction in its calculus for determining what constitutes conspicuous language.

■■■ The principle to be distilled from these cases is that in order for a disclaimer to be conspicuous, it must have particular distinction. Equally, the court must examine the nature of the parties to the transaction in undertaking its "conspicuous" analysis. The court concludes that the various factors to be considered by a court in determining whether a document is conspicuous for purposes of disclaiming an implied warranty pursuant to subsection 36–2–316(2) include the following: (1) the color of print in which the purported disclaimer appears; (2) the style of print in which the disclaimer is written; (3) the size of the disclaiming language, particularly in relation to other print in the document; (4) the location of the disclaimer in the contract;

(5) the appearance of the term "merchantability" with respect to color, style, size, and type of print in the disclaimer clause; and (6) the status of the parties contesting the validity of the disclaimer, namely whether they be consumers or commercially sophisticated entities. While these factors lend aid to the determination of what constitutes "conspicuous" language, the court believes that no single factor is dispositive nor are these enumerated factors exhaustive of all the criteria that can be used in examining a disclaimer.

■■■ The disputed disclaimer provides in pertinent part:

This constitutes Brooks' only warranty in connection with this sale and is in lieu of all other warranties, expressed or implied, written or oral. THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE THAT APPLY TO THIS SALE. No employee, agent, dealer or other person is authorized to give any warranties on behalf of Brooks, nor to assume for Brooks any other liability in connection with any of its products without prior written approval by an officer of Brooks.

The court concludes that this disclaimer meets the requirements of subsection 36–2–316(2):

First, the disclaiming language explicitly mentions merchantability and plainly states that there is no implied warranty with respect to the transaction; furthermore, the word "merchantability" is written in uppercase letters. *See Winter Panel Corp. v. Reichhold Chemicals, Inc.,* 823 F.Supp. 963, 973 (D.Mass.1993) (holding that warranty limitation clause stating that warranty of merchantability was disclaimed was conspicuous when printed in bold, capital letters). Here, the clause is couched in terms of "merchantability" and clearly states that any such warranty is disclaimed. Because the clause expressly uses the word "merchantability," the court concludes that the first criterion of the statute is satisfied.

Second, the language and form of the disclaimer is "conspicuous." Here, the disclaimer is printed in large-type, capital letters;

thus, the style and size are distinct from the other print in the contract. *See id.* As in *Sowards,* the fact that the disclaimer is written on the reverse side of the contract does not render it invalid because the printing is distinct. *See also Winter Panel Corp.,* 823 F.Supp. at 973 (holding that disclaimers are effective even though printed on the reverse side of the contract because a sentence on the front of the contract referred the purchaser to the reverse side). Moreover, as in *Walter E. Heller,* the instant contract is not lengthy but consists of only two pages. With respect to location, the disclaimer is on the back of page one and is prominently located at the top of the second column. Unlike *South Carolina Electric & Gas* and *Cooley,* the disclaiming language is not "buried" in many pages of contractual terms. Also, both Myrtle Beach and Emerson are corporations engaged in a commercial transaction, as were the parties in *Investors, American,* and *AMF.* Both parties are sophisticated entities familiar with commercial negotiations. Holding that such parties would be unawares of such exclusions does indeed "strain credulity." Accordingly, this court holds that the disclaimer is "conspicuous" pursuant to subsection 36–1–201(10). Hence, the second criteria of subsection 36–2–316(2) has been met.

Third, the disclaimer clause satisfies the requisite specificity. The language simply states that the express warranty is the sole warranty and that any other purported warranties are expressly disclaimed. The language elaborates on this exclusion by stating that there are no warranties of merchantability or fitness for a particular purpose. Finally, the clause concludes by providing that Myrtle Beach cannot rely on warranties based on representations by Brooks or others, nor will Brooks assume any further liability without written modification and approval. There is nothing vague about this disclaimer clause, and therefore the court holds that the specificity requirement of subsection 36–2–316(2) has also been met.

Having concluded that the disclaimer mentions merchantability, is conspicuous and specific, the court must now determine whether the disclaimer is ambiguous. In *Valtrol, Inc.,* the Fourth Circuit upheld disclaimer provisions in a contract negotiated between two corporate entities, noting that the Uniform Commercial Code expressly provides for such limitations of liability. *Valtrol, Inc.,* 884 F.2d at 154. Whether an ambiguity exists regarding a disclaimer is a matter of law reserved for the court. *Utah Power & Light Co. v. Babcock & Wilcox Co.,* 795 F.Supp. 1074, 1077 (D.Utah 1992). In *Utah Power & Light,* the parties disputed whether a disclaimer of implied warranties was ambiguous. *Id.* The court concluded that the disclaimer was not ambiguous and therefore granted the defendant's motion for summary judgment as to a breach of implied warranties. *Id.* The court premised its conclusion on the language of the contract, which stated in pertinent part:

> THE COMPANY AND PURCHASER AGREE THAT IN CONSIDERATION OF THE ABOVE EXPRESS PERFORMANCE GUARANTEES THAT ALL OTHER PERFORMANCE ... EITHER EXPRESS OR IMPLIED ... INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXCLUDED FROM THIS CONTRACT.

*Id.* at 1076. The court held, as a matter of law, that this language was "not ambiguous." *Id.* at 1077; *see also McDermott, Inc. v. Iron,* 979 F.2d 1068, 1076 (5th Cir.1992) (noting that "broadly worded clauses may be sufficient where sophisticated business entities are involved"), *cert. granted in part,* —— U.S. ——, 113 S.Ct. 3033, 125 L.Ed.2d 721 (1993).

Relying on *Hartman v. Jensen's, Inc.,* 277 S.C. 501, 289 S.E.2d 648 (1982), Myrtle Beach contends that the disclaimer is ambiguous because the paragraph containing the disclaimer is prefaced with the heading "WARRANTY," implying a grant of warranty, rather than a disclaimer of warranty. Myrtle Beach's attempts to bring this action within the ambit of *Hartman* fail because *Hartman* is inapposite to these facts. In *Hartman,* Plaintiff Hartman brought negligence and breach of implied warranty claims against Jensen's, a corporate entity manufacturing and selling mobile homes. *Id.,* 289 S.E.2d at 649. Jensen maintained that it

explicitly disclaimed any implied warranty of merchantability in the sales contract. *Id.* The Supreme Court of South Carolina held, however, that the disclaimer was ineffective because it was written under the heading "TERMS OF WARRANTY." *Id.* The court summarily concluded that this heading "suggested a grant of warranty rather than a disclaimer," and thus "created an ambiguity ... *likely to fail to alert the consumer* that an exclusion of the warranty was intended." *Id.* (emphasis added). Construing this ambiguity against the seller, the court refused to enforce the disclaimer. *Id.*

*Hartman* is distinguishable from the instant case. First, in *Hartman,* the warranty provision of the contract, was, as far as the opinion reveals, limited only to a disclaimer of warranties. Conversely, in the contract between Myrtle Beach and Emerson, the warranty provision of the contract contained an express warranty as well as a disclaimer. The warranty provision heading therefore contained a "grant of warranty," as well as a disclaimer. Second and paramount, the *Hartman* court specifically stated that the ambiguity would fail to apprise the *consumer* that the implied warranty was being disclaimed. *Hartman* is therefore limited to transactions involving a consumer. The scope of the opinion is not, as Myrtle Beach urges, all-encompassing and meant to embrace all commercial transactions. Here, no consumer was involved; rather, the context of this transaction is a commercial negotiation between two sophisticated corporate entities. Accordingly, *Hartman* does not govern the disposition of Myrtle Beach's breach of implied warranty of merchantability claim. The court concludes that the present disclaimer is not ambiguous. Because the disclaimer meets the strictures imposed under the statute, this court must enforce it because it effectuates the intent of the parties.

Myrtle Beach also urges the court to apply *Standard Boiler & Plate Iron Co. v. Brock,* 112 S.C. 323, 99 S.E. 769 (1919), and *Gold Kist, Inc. v. Citizens & Southern National Bank,* 286 S.C. 272, 333 S.E.2d 67 (Ct.App. 1985). These cases are likewise inapposite. *Standard Boiler* did not, as here, involve an express disclaimer. Moreover, that case was adjudicated prior to the enactment of the Uniform Commercial Code as adopted in South Carolina. Thus, most of *Standard Boiler's* precedential value has been undermined by subsequent legislation. Equally, *Gold Kist* is inapplicable because the purported disclaimers did not form part of the contract as here. Rather, in *Gold Kist,* the purported disclaimers were made subsequent to the formation of the contract, were conveyed on the bag in which the product was carried, and were never disclosed to the purchaser. *Gold Kist, Inc.,* 333 S.E.2d at 70–71. *Gold Kist* is therefore factually very different from the present action.

The Uniform Commercial Code clearly provides for disclaimers, and here the disclaimer clearly stated the rights and obligations of the parties. There is nothing vague of indefinite about the disclaimer. Therefore, the court concludes that the disclaimer is not ambiguous.

### 2. *Limitation of Remedy*

Section 36–2–316 not only provides for disclaimers of implied warranties, but also provides for limitation of remedies for breach of warranty claims, *see* § 36–2–316(4). Subsection 36–2–316(4) shifts the parties to either of two damages provisions: either section 36–2–718, which generally provides for liquidated damages, or section 36–2–719, which provides for various limitations on a buyer's remedies, such as repair or replacement of the defective good and exclusion of consequential damages. Here, subsection 36–2–719(1)(a) applies because the parties dispute whether Myrtle Beach's sole remedy is repair or replacement of the air eliminator and whether Myrtle Beach is precluded from recovering consequential damages. Emerson asserts that the sole remedy available to Myrtle Beach is repair or replacement of the air eliminator and that consequential damages were expressly excluded by the contract. Myrtle Beach, however, advances a two-pronged argument regarding the limitation of remedy. First, Myrtle Beach contends that the disclaimer of implied warranty of merchantability is ineffective, and thus Myrtle Beach may claim damages for all injuries proximately caused by the air eliminator.

The court has previously concluded that the disclaimer of the implied warranty of merchantability is valid and effective; hence, this contention fails. Second, Myrtle Beach argues that even if the disclaimer is valid, the remedy fails of its essential purpose and thus Myrtle Beach may resort to other remedies. In this action, inquiry into the remedy is crucial because the overwhelming amount of damages are for clean up costs and litigation expenses.

Section 36–2–719 provides:

(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section (§ 36–2–318) on liquidation and limitations of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

S.C.Code Ann. § 36–2–719. Thus, the court must make three inquiries: (1) whether the contract limited the remedy to repair or replacement; (2) whether, if the remedy were so limited, it failed of its essential purpose; and (3) whether, if the limited remedy failed of its essential purpose, consequential damages may be recovered because their exclusion is unconscionable. These inquiries are addressed seriatim.

a. *Exclusivity of Remedy*

Before considering the enforceability of a limited remedy, the court must first "establish[ ] that the contract contains 'an exclusive or limited remedy.'" *Chatlos Sys., Inc. v. National Cash Register Corp.,* 635 F.2d 1081, 1085 (3d Cir.1980) (quoting § 2–719(1)(b)) (applying New Jersey law), *cert. dismissed,* 457 U.S. 1112, 102 S.Ct. 2918, 73 L.Ed.2d 1323 (1982). The Uniform Commercial Code requires that the exclusivity of a limited remedy be made explicit, *see* § 36–2–719(1)(b), and failure to do so will result in the limited remedy's being construed as an optional additional remedy and will not preclude the availability of other remedies under the Code, *see* § 36–2–719(1)(b). Here, the contract between the parties, with respect to remedy, provides:

Limitation of Remedy: Brooks will repair or replace at Brooks' option, F.O.B. factory, any Brooks parts defective in workmanship or materials if such part is returned, freight prepaid, within one year from date of shipment to the nearest factory authorized service station or to the factory. *It is agreed that such replacement or repair is the exclusive remedy available from Brooks should any of Brooks['s] products prove defective.* Brooks is not liable for damages of any sort, including incidental and consequential damages.

(emphasis added). The court begins with the premise that "[s]uch agreed upon limits on remedy are generally valid." *McDermott, Inc.,* 979 F.2d at 1072. Indeed, the Fourth Circuit has enforced the limited remedies provisions of section 36–2–719. *See Valtrol, Inc.,* 884 F.2d at 154 (enforcing the limited remedy because "the parties bargained for an exclusive repair or replacement warranty"). The case law reveals that exclusivity clauses less explicit than the one at bar have been sustained. For example, in *Wyatt Industries v. Publicker Industries,* 420 F.2d 454 (5th Cir.1969), the contract between the parties provided:

Guarantee: Fabricator warrants the complete work against defective material and workmanship, exclusive of corrosion or erosion, for the period of one year from completion thereof. Its liability under this

warranty shall be limited to the replacement within the aforesaid time of any defective work or material f. o. b. Fabricator's shop, and Fabricator shall be liable for no other damages or losses.

*Id.* at 456. The buyer sued, claiming breach of warranties and various consequential damages. The court, however, concluded that the disclaimer was sufficiently exclusive to limit the buyer to the stipulated remedy of replacement. *Id.* at 457. The Fifth Circuit, therefore, upheld the clause as containing an exclusive remedy even though neither the terms "exclusive," "sole," or "only," nor any other limiting language, were expressed in the contract. Other courts have similarly upheld repair and replacement remedies as being exclusive, *see, e.g., McDermott,* 979 F.2d at 1073; *Riegel Power Corp. v. Voith Hydro,* 888 F.2d 1043, 1045–46 (4th Cir.1989), even though in some instances "an argument might be made that this [exclusivity] is not clearly expressed," *Chatlos Sys.,* 635 F.2d at 1081. Limitation clauses providing that the remedy of repair or replacement shall be exclusive are likewise sustained, *see, e.g., Smith v. Navistar International Transportation Corp.,* 957 F.2d 1439, 1441–45 (7th Cir. 1992), *Kaplan v. RCA Corp.,* 783 F.2d 463, 464–67 (4th Cir.1986), particularly where, as here, both parties to the contract are commercially sophisticated entities, *see, e.g., McDermott, Inc.,* 979 F.2d at 1072–73; *Chatlos Sys.,* 635 F.2d at 1087. Commentators have noted that "the more explicit the limitation-of-remedy clause is, the more likely it will be enforced." James J. White & Robert S. Summers, *Uniform Commercial Code* § 12–9, at 522 (3d ed. 1988). Here, because the contract expressly and clearly states that the remedy of repair or replacement shall be exclusive, the court concludes that the parties did agree to the exclusive, limited remedy of repair or replacement. Accordingly, Myrtle Beach may not seek other contractual remedies unless the limited remedy of repair or replacement fails of its essential purpose and the exclusion of consequential damages would be unconscionable.

### b.  *Failure of Essential Purpose*

■ Having concluded that the limited remedy is the exclusive remedy pursuant to

subsection 36–2–719(1)(b), the court must now determine whether the limited remedy failed of its essential purpose pursuant to subsection 36–2–719(2). This court begins, as it must, by examining the statutory language. *See K–Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291–92, 108 S.Ct. 1811, 1817–18, 100 L.Ed.2d 313 (1988). Subsection 36–2–719(2) provides that "an exclusive or limited remedy [must] fail of *its* essential purpose" before additional remedies may be sought (emphasis added). Similarly, Official Comment 1 notes that this subsection applies to "an apparently fair and reasonable clause" that "because of circumstances fails in *its* purpose or operates to deprive either party of the substantial value of the bargain" (emphasis added). The statute and the comment, therefore, use the possessive pronoun "its" to refer to the limited remedy's failing of its essential purpose. Thus, the court must determine whether the limited remedy as provided for by the parties fails of its purpose, rather than whether the limited remedy constituted appropriate relief or, with hindsight, objectively served the purpose of contract law. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 12–10, at 523 (3d ed. 1988) ("[Subsection] 2–719(2) should be triggered when the remedy fails of *its* essential purpose, not of the essential purpose of the Code or of contract law or of justice or of equity.").

■ The primary objective of the limited remedy is to provide the seller an opportunity to tender conforming goods and thereby limit his exposure to risk for other damages, while simultaneously providing the purchaser with the benefit of his bargain—i.e.—conforming goods. *See Chatlos Sys.,* 635 F.2d at 1085. Thus, the repair or replacement remedy seeks to perform the contract as intended by the parties. For example, in *Waters v. Massey–Ferguson, Inc.,* 775 F.2d 587 (4th Cir.1985), the court permitted recovery of consequential damages to a farmer, even though there was an exclusion of such damages. The court held that recovery was permissible under the narrow facts of the case because the parties premised the warranty provisions on certain repair, but repair efforts never proved successful. *Id.* at 591–92.

Once repair became impossible, the court held that the limitation of consequential damages no longer applied. *Id.* Against this purpose, this court examines the success or failure of the limited remedy of repair or replacement.

■ The limited remedy of repair or replacement fails of its essential purpose if the seller will not or cannot repair or replace the defective product with a conforming product or there is unreasonable delay in repair or replacement. *See McDermott, Inc.*, 979 F.2d at 1073 ("Typically, a limited repair/replacement remedy fails of its essential purpose where (1) the seller is unsuccessful in repairing or replacing the defective part, regardless of good or bad faith; or (2) there is unreasonable delay in repairing or replacing defective components.") (internal quotation marks, alterations, and citation omitted); *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 707–08 (9th Cir.1990) ("A contractual provision limiting the remedy to repair or replacement of defective parts fails of its essential purpose ... if the breaching manufacturer or seller is unable to make the repairs within a reasonable time period."); *Riegel Power Corp.*, 888 F.2d at 1046 ("Generally, in the commercial cases, the 'essential purpose' exclusion arises only where the seller has refused to make repairs as he was required or where he cannot repair the product."); *Delhomme Indus. v. Houston Beechcraft*, 669 F.2d 1049, 1063 (5th Cir.1982) ("The test in determining whether a limited warranty failed of its essential purpose is whether the buyer is given, within a reasonable time, goods that conform to the contract."); *Chatlos Sys.*, 635 F.2d at 1085 ("When presented with the question whether an exclusive repair remedy fails of its essential purpose, courts generally have concluded that so long as the buyer has use of substantially defect-free goods, the limited remedy should be given effect. But when the seller is either unwilling or unable to conform the goods to the contract, the remedy does not suffice.").[8] The inquiry focuses on whether the circumstances "make it exceedingly impractical to carry out the essence of an agreed-upon remedy," *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co.*, 709 F.2d 427, 431 (6th Cir.1983), and "[t]he essential purpose of the limited warranty can only be gleaned from the transaction," *Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102, 1007 (4th Cir.1980). The Uniform Commercial Code has not attempted to set parameters for defining a failure of essential purpose. The Fourth Circuit has noted that these parameters were not defined in order to preserve freedom of contract and allocation of duties and liabilities as contemplated by the Code. *See Riegel Power Corp.*, 888 F.2d at 1045. The *Riegel Power Corp.* court further noted that there are "relatively few situations where a remedy [such as the repair or replace provision] can fail of its essential purpose." *Id.* (alteration in original) (internal quotation marks omitted). Indeed, the decisional law reveals, particularly with respect to commercially sophisticated entities, that the limited remedy of repair or replacement is generally held to have performed its essential purpose if the seller timely cures the defects. *See, e.g., McDermott, Inc.*, 979 F.2d at 1073 (no failure of essential purpose where seller replaced the product and both parties were sophisticated entities); *Riegel Power Corp.*, 888 F.2d at 1046 (limited remedy did not fail of its essential purpose in commercially sophisticated transaction where seller made necessary repairs); *Marr Enters., Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951, 955–56 (9th Cir.1977) (limited remedy of repair or replacement did not fail of its essential purpose where seller promised repair or replacement or refund of purchase price).

8. The commentators agree. Professor Eddy has described the premise of the limited remedy of repair and replacement thusly:

> The ... picture of the limited repair warranty ... rests upon at least three assumptions: that the warrantor will diligently make repairs, that such repairs will indeed "cure" the defects, and that consequential loss in the interim will be negligible. So long as these assumptions hold true, the limited remedy appears to operate fairly and, as noted, will usually withstand contentions of "unconscionability."

Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of U.C.C. Section 20719(2)*, 65 Cal.L.Rev. 28, 63 (1977).

■ While the test for determining whether the repair or replacement remedy has failed of its essential purpose is relatively uniform, there is a dearth of law on the test's application. The Fourth Circuit, applying Delaware law, utilized the following factors to determine whether a limited remedy failed of its essential purpose: (1) "the facts and circumstances surrounding the contract;" (2) "the nature of the basic obligations of the party;" (3) "the nature of the goods involved;" (4) "the uniqueness or experimental nature of the items;" ˙ (5) "the general availability of the items;" and (6) "the good faith and reasonableness of the provision." *Riegel Power Corp.*, 888 F.2d at 1045 (internal quotation marks omitted) (quoting *J.A. Jones Const. Co. v. Dover*, 372 A.2d 540, 549 (Del.Super.Ct.), *appeal dismissed*, 377 A.2d 1 (Del.1977)).[9] The *Riegel Power Corp.* court further stated that "[o]ne of the most relevant" of the enunciated factors was inquiry into the type of product sold. *Id.* This inquiry bears not only on the product, but also on the context of the transaction—i.e.—whether the sale was a commercial or consumer transaction. *Id.* This court will therefore determine whether the repair or replacement remedy failed of its essential purpose by applying the *Riegel Power Corp.* factors. Applying these factors, this court concludes that the limited remedy of repair or replacement did not fail of its essential purpose:

■ First, this is a commercial transaction involving two sophisticated corporate entities; no consumers are involved. Moreover, there is little or no disparity in the bargaining power of the parties. Unlike *Waters*, this is not a case where recovery of consequential damages is proper because there is no predicate for unsuccessful attempts at repair. The "facts and circumstances surrounding" this transaction reveal that this contract was freely entered into by two corporations well-versed in commercial practices. Understanding this commercial context cannot be divorced from the concept of limited remedies.

Second, the obligations of the parties were mutual; the promise of neither party was onerous in this transaction. The contract is relatively simple in that Myrtle Beach solicited an air eliminator, and Emerson accepted the offer to provide one. Because the parties entered into this contract on an equal footing, the court should enforce it according to its terms.

Third and Fourth, the type of product involved is a critical factor affecting not only the context of the transaction—i.e.—consumer versus commercial, but also upon the degree of sophistication of the product itself. As noted, this a commercial transaction between two corporations. Therefore, the need to "protect" the buyer is correspondingly less than if the buyer were a consumer. Also, the air eliminator is not a casually-purchased, readily-available item; rather, Myrtle Beach sought an engineer to design the component, and based on Ancira's specifications, Emerson constructed it. When such is the case, the repair or replacement remedy is particularly compelling: "[W]here the goods are experimental items, of complicated design, or *built especially for the buyer* . . . the repair or replacement clause may simply mean that the seller promises to use his best efforts to keep the goods in repair and in working condition. . . ." *Id.* at 1046 (quoting 3 Hawkland *Uniform Commercial Code Series* 447 (Callaghan 1984)); *see also American Elec. Power Co.*, 418 F.Supp. at 458 (noting that the limited remedy of repair or replacement is particularly apt in cases of specialty machinery). The facts of this case therefore compel a finding that repair or replacement has not failed of its essential purpose. A finding that the repair or replacement remedy has not failed when a product is specially manufactured or experimental is easily understood: because of the unique or novel nature of the product, the parties do not know whether it will be a success. Holding a seller liable for a product based on specifications drawn by the purchaser improperly allocates the risk of loss here and is contrary

---

**9.** The *Riegel Power Corp.* court did not "adopt" this test; however, this court likewise applies this test to the case at bar. The court further notes that the Fifth Circuit has cited the *J.A. Jones*

*Const. Co.* factors with apparent approval. *See Delhomme Indus. v. Houston Beechcraft, Inc.*, 669 F.2d 1049, 1063 n. 38 (5th Cir.1982).

to the contract. Because the air eliminator was just such a product, the repair or replacement remedy cannot be held to have failed of its essential purpose.

Fifth, this air eliminator is not generally available. Indeed, Myrtle Beach had it designed by an engineer, who, in turn, requested that Emerson manufacture the air eliminator according to his specifications. These facts demonstrate that the air eliminator is not a common item.

Sixth, the clause setting forth the limitation is common between commercial merchants. *See McDermott*, 979 F.2d at 1076 (noting that exclusionary clauses are "common in commercial markets"); *Waters*, 775 F.2d at 590 (noting that a disclaimer provision similar to the one in this case is often referred to as "the standard warranty"). Moreover, Emerson has made itself ready to repair or replace the air eliminator. Here, the risk was allocated to Myrtle Beach by the express terms of the contract that the parties executed. Had Myrtle Beach not desired to bear this risk, it had ample opportunity to shift the risk to Emerson or to disavow the contract, but it did neither; so it cannot now complain. In light of the above, this court holds that the limited remedy of repair or replacement does not fail of its essential purpose.

#### c. *Exclusion of Consequential Damages*

Concluding that the limited remedy did not fail of its essential purpose pursuant to subsection 36–2–719(2), merely narrows, but does not end, the inquiry. The issue now becomes whether the exclusion of consequential damages, as here, would be unconscionable; and thus the court must separately examine subsection 36–2–719(3), which provides:

> (3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

S.C.Code Ann. § 36–2–719(3). Determining the propriety of excluding consequential damages is a separate and distinct inquiry from determining whether a limited remedy may be upheld:

> The limited remedy of repair and a consequential damages exclusion are two discrete [limitations]. The Code, moreover, tests each by a different standard. The former survives unless it fails of its essential purpose, while the latter is valid unless it is unconscionable. We therefore see no reason to hold ... that the failure of the limited remedy ... without more, invalidates a wholly distinct term in the agreement excluding consequential damages.

*Chatlos Sys.*, 635 F.2d at 1086 (footnote omitted). *See also Lewis Refrigeration Co.*, 709 F.2d at 435 ("[T]he distinctly different substantive content of subsection (2) and (3) must be considered. Subsection (2) turns on the failure of essential purpose; subsection (3) turns on a judicial determination of unconscionability."); *AES Technology Sys. v. Coherent Radiation*, 583 F.2d 933, 941 (7th Cir.1978) ("[W]e reject the contention that failure of the essential purpose of the limited remedy automatically means that a damage award will include consequential damages."). There is, however, authority for holding that once a limited remedy fails of its essential purpose, then the exclusion of consequential damages likewise fails. *See, e.g., R.W. Murray Co. v. Shatterproof Glass Corp.*, 758 F.2d 266, 272 (8th Cir.1985).

The Fourth Circuit has not directly taken a stance on this position, but it has observed that "recent cases indicated that the two provisions are independent and are to be applied as such." *Riegel Power Corp.*, 888 F.2d at 1047 (dicta); *Kaplan v. RCA Corp.*, 783 F.2d 463, 467 (4th Cir.1986) ("[A] finding that the repair and replacement warranty had failed would not void [defendant's] exclusion of consequential damages provision as well[,] [a]lthough some courts have adopted that position.") (applying New Jersey law) (citations omitted). The better view, and that previously applied by the Fourth Circuit, is that the exclusion of consequential damages is a separate inquiry from determining whether a limited remedy failed of its essential purpose. The Uniform Commercial Code provides for each of these limi-

tations in separate subsections by noting that each is a separate form of limitation. More revealing still, however, is that these inquiries are resolved by different standards: the limited remedy of repair and replacement is determined by whether it failed of its essential purpose, while the exclusion of consequential damages is measured by whether the exclusion is unconscionable. Thus, this court concludes that it must examine separately the contract's exclusion of consequential damages. Parenthetically, the court notes that even if a limited remedy does fail of its essential purpose, consequential damages may still be excluded. *See, e.g., Kaplan,* 783 F.2d at 467; *S.M. Wilson & Co. v. Smith Int'l, Inc.,* 587 F.2d 1363, 1374–75 (9th Cir.1978); *Dowty Communications, Inc. v. Novatel Computer Sys.,* 817 F.Supp. 581, 588–89 (D.Md.1992) (dicta).

■ While these are separate inquiries, however, the limited remedy's failure "is not completely irrelevant to the issue of the conscionability of enforcing the consequential damages exclusion." *Chatlos Sys.,* 635 F.2d at 1086–87. Exclusion of consequential damages is, like the limited remedy of repair or replacement, merely another vehicle for allocation of risk and must be examined in light of the context of the transaction. *Id.* Thus, examination of preclusion of consequential damages must be assessed based on the circumstances surrounding formation of the contract. As the Seventh Circuit has noted, "determin[ing] whether consequential damages are warranted [requires examination of] the individual factual situation including the type of goods involved, the parties and the precise nature and purpose of the contract." *AES Technology Sys.,* 583 F.2d at 941. Determining whether consequential damages have been properly excluded is *ad hoc. Id.*

■ Consequential damages may be excluded, provided that this exclusion is not "unconscionable." *See* § 36–2–719(3). "Unconscionability" is not defined in the Uniform Commercial Code, and the term necessarily invites speculation. For determining unconscionability, "[t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." § 36–2–302 official cmt. 1. One of the seminal cases attempting to define the term has noted that "[u]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams v. Walker–Thomas Furniture Co.,* 350 F.2d 445, 449 (D.C.Cir.1965). Unconscionability therefore appears to turn on the oppressive nature of the terms of the contract as well as the lack of sophistication of the parties in striking their agreement.[10] Whether an exclusion is unconscionable is a matter of law reserved for determination by the court. *See Delhomme Indus.,* 669 F.2d at 1063. The Fourth Circuit has cited various factors to be used in assessing unconscionability: (1) "the nature of the injuries suffered by the plaintiff;" (2) "whether the plaintiff is a substantial business concern;" (3) "disparity in the parties' bargaining power;" (4) "the parties' relative sophistication;" (5) "whether there is an element of surprise" in the exclusion; and (6) "the conspicuousness of the clause." *Kaplan,* 783 F.2d at 467 (applying New Jersey law). Application of these factors reveals that the exclusion of consequential damages is not unconscionable here:

■ First, the nature of the injury sustained by Myrtle Beach is commercial; no personal injury has been sustained.[11] This fact is "significant under the Code" because while "[l]imitations on damages for personal injuries are not favored ... no such prejudice applies to property losses." *Chatlos Sys.,* 635 F.2d at 1087. Where the claim is

---

10. The courts have characterized "one-sided" contracts as being "substantively" unconscionable and disparity of choice and bargaining power as "procedurally" unconscionable. *See* E. Allen Farnsworth, *Contracts* § 4.28, at 314 (7th ed. 1982).

11. The court further notes that the losses claimed by Myrtle Beach are not even to its property. This aspect of the case is discussed in detail, *see infra* at pp. 1056–62.

merely for commercial losses, the cause for sustaining the exclusion of consequential damages is far greater. *See Kaplan,* 783 F.2d at 467 (noting that where "losses suffered ... were commercial" the bar to consequential damages will be enforced); *Chatlos Sys.,* 635 F.2d at 1087 (noting that where "claim is for commercial loss," the contract should be enforced as written).

Second, Myrtle Beach is a "substantial business concern" that can amply police its own bargains. That Myrtle Beach is a corporation able to manage its own affairs is not disputed. Moreover, as the Sixth Circuit noted, "numerous decisions have pointed out [that] unconscionability rarely exists unless the buyer is a consumer." *Lewis Refrigeration Co.,* 709 F.2d at 435 (collecting cases). Additionally, damage limitation clauses are not unconscionable because they are "a reasonable allocation of risk between *two* commercial entities." *Winter Panel Corp.,* 823 F.Supp. at 973 (emphasis added); *see also Investors Premium Corp.,* 389 F.Supp. at 45 (upholding an exclusion of consequential damages in a contract between two commercial entities because "[t]here is nothing unconscionable about them in situations such as this"). Such exclusions of consequential damages are particularly apt where, as here, "the product at issue was a complex, sophisticated, [or] experimental substance." *Winter Panel Corp.,* 823 F.Supp. at 973; *see also Kaplan,* 783 F.2d at 467 (holding that consequential damages were properly precluded where, among other reasons, plaintiff had the product engineered for his particular purposes). Such an allocation of risk is properly on the purchaser because a seller will not incur the "risks of potential failure." *Winter Panel Corp.,* 823 F.Supp. at 973. *Kaplan* is especially pertinent on this allocation of risk to the buyer of a product that has the potential to cause far-reaching consequential injury: "[Defendant] did not have to subject itself to multi-million dollar liability for consequential losses by supplying a [product] for $12,000. It could, as it did, properly allocate that risk to [plaintiff]." *Kaplan,* 783 F.2d at 467.

Third, the parties enjoy equal bargaining power. Myrtle Beach and Emerson are both corporations able to deal with each other at arm's length. Their contract should be enforced to preserve the sanctity of the law of contract; not enforcing this valid contract would be unconscionable. As the *Smith* court observed, "parties of relatively equal bargaining power can allocate all of the risks that may accompany a breach of warranty." *Smith,* 957 F.2d at 1444. Where two corporations have freely contracted, exclusions to consequential damages are often enforced. *See, e.g., Kaplan,* 783 F.2d at 467; *Chatlos Sys.,* 635 F.2d at 1087; *Winter Panel Corp.,* 823 F.Supp. at 973. The parties approached this transaction on an equal footing, and thus there is no disparity between them. *See American Elec. Power Co.,* 418 F.Supp. at 458 (sustaining limitations "negotiated between industrial giants").

Fourth, these parties are also sophisticated and well-versed in commercial transactions. The Fifth Circuit has succinctly recognized the importance of the sophistication of the parties in assessing unconscionability under subsection 2–719(3):

> Contracts freely arrived at and fairly made are favorites of the law. None of the parties here involved were neophytes or babes in the brambles of the business world. Both companies, it would appear, dealt in projects involving considerable sums of money; both operated substantial businesses; and there is no suggestion that their businesses were not capably managed and profitably operated.

*Delhomme Indus.,* 669 F.2d at 1062 (quoting *Kansas City Structural Steel Co. v. L.G. Barcus & Sons,* 217 Kan. 88, 535 P.2d 419, 424 (1975)). That Myrtle Beach and Emerson are sophisticated is not disputed.

Fifth, exclusions of consequential damages are common in commercial transactions. *See Winter Panel Corp.,* 823 F.Supp. at 973; *Investors Premium Corp.,* 389 F.Supp. at 45. In this case, the exclusion was "clearly expressed in a short, easily understandable sales contract," and thus there is no " 'surprise' element present here." *Chatlos Sys.,* 635 F.2d at 1087. Rather, the exclusion of consequential damages was simply stated in the contract; and it presented no "surprise." *See Kaplan,* 783 F.2d at 467. The frequency

of such exclusions in commercial transactions, coupled with the clarity of this particular exclusion, compels this court to hold that there was nothing shocking about the exclusion of such damages.

Finally, this exclusion was conspicuous, being clearly provided for under a subheading that read "Limitation of Remedy." This is not a case of the exclusionary clause being "lost in a linguistic maze." *Id.* (internal quotation marks omitted). The preclusive language was simply and noticeably stated. The court therefore holds that the exclusion of consequential damages was not "unconscionable" under subsection 36-2-719(3). In short, the case law is rife with courts' sustaining exclusions of consequential damages. *See, e.g., Smith,* 957 F.2d at 1443-45; *Kaplan,* 783 F.2d at 466-67; *Chatlos Sys.,* 635 F.2d at 1087; and *Winter Panel Corp.,* 823 F.Supp. at 973. Therefore, this court holds that the disclaimer of implied warranty of merchantability was effective, the limited remedy did not fail of its essential purpose; and even if it did, the exclusion of consequential damages was not unconscionable. Accordingly, the sole remedy available to Myrtle Beach is that of repair or replacement.

## B. *The Tort Claim*

The court must now embark upon that ill-defined, though well-trod, boundary between the realms of contract and tort. Maintaining a footing on this boundary proves difficult indeed because the boundary that separates these realms is blurred. The court's excursion is rendered more perilous because the parties are arrayed on opposite sides of this boundary and urge the court to their respective camps: Myrtle Beach asserts that it may maintain a negligence claim against Emerson and therefore invites the court into the realm of tort. Conversely, Emerson contends that Myrtle Beach may only assert a breach of warranty claim and thus argues that the case is confined to the realm of contract. The court must therefore decide whether a genuine tort claim lies or whether this action sounds exclusively in contract. The compass guiding the court through these separate but overlapping worlds is the doctrine of economic loss.

## 1. *Sailing the Straits of East River*

In *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the defendant, pursuant to a contract with the plaintiffs, designed, manufactured, and installed turbines in four tankers. *Id.* at 859, 106 S.Ct. at 2296. A component in these turbines proved defective and all of the tankers were injured as a result. *Id.* at 860-61, 106 S.Ct. at 2296-97. The plaintiffs sued under theories of negligence and strict liability; but the Supreme Court rejected their tort claims, holding that whether cast in terms of negligence or strict liability, no products liability claim exists in admiralty when a commercial plaintiff alleges injury only to the product itself because such loss is purely economic. *Id.* at 871, 106 S.Ct. at 2302. Relying on the Uniform Commercial Code, the Court stated that the action was really one sounding in breach of warranty; and thus plaintiffs would be limited to their contractual remedies because a tort action could not be maintained. *Id.* at 872-73, 106 S.Ct. at 2302-03. The Court concluded:

> In this case, there was no damage to "other" property.
>
> . . . .
>
> [S]ince ... no person or other property is damaged, the resulting loss is purely economic.
>
> . . . .
>
> [W]e ... hold that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself.... When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong.
>
> . . . .
>
> [W]hen a product injures only itself, the commercial user stands to lose the value of the product, risks the displeasures of its customers, ... or, ... experiences increased costs in performing a service. Losses like these can be insured.

*Id.* at 867, 870–72, 106 S.Ct. at 2300, 2301–03 (footnote and citations omitted). Accordingly, because the injury was confined solely to the product itself, the plaintiffs were barred from pursuing their tort claim. Thus, within a commercial context where the only injury is to the product itself, the law of contract must prevail; there can be no tort recovery for purely economic loss.

The Court premised its conclusion on four reasons. First was the traditional differences between contract and tort law; the law of torts encourages safe conduct, while the law of contract encourages business transactions. The "tort concern with safety is reduced when an injury is only to the product itself." *Id.* at 871, 106 S.Ct. at 2302. Second, the Court noted that injury to the product itself is best understood as a warranty claim. When only the product is injured, the essence of the injury can be traced to whether the product functioned as represented. Whether products meet their representations falls within the ambit of warranty law. Remedies for breach of warranty "sufficiently protect[] the purchaser by allowing it to obtain the benefit of its bargain," and thus place the purchaser in the same position it would have been in had the product functioned properly. *Id.* at 873, 106 S.Ct. at 2303. Third, the law of contract permits parties to allocate risk, whereas tort risks are assigned as a matter of law. In a commercial context, there is simply no justification for a court to disturb the allocation of risk of injury to the product because the parties have a contract that makes just such an allocation. *Id.* Fourth, the Court stated that liability for injuries to a product itself is more properly limited by warranty remedies, that inherently limit liability, rather than by tort remedies that expose a manufacturer to broader liability and indefinite damages. *Id.* at 873–74, 106 S.Ct. at 2303–04. Central to the Court's reasoning therefore was the fact that "[c]ontract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements." *Id.* at 872–73, 106 S.Ct. at 2302–03. The underlying reason that the Court denied a tort claim for economic loss was because such loss represents "the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law." *Id.* at 876, 106 S.Ct. at 2304.

This "economic loss" doctrine therefore bars tort claims and limits a plaintiff's recovery to those contractual remedies provided by the Uniform Commercial Code where the suit arises out of a commercial transaction and the loss incurred is only to the product itself. Thus, the "doctrine hinges on a distinction ... between transactions involving the sale of goods ... where economic expectations are protected by commercial and contract law, and those involving the sale of defective products to individual consumers who are injured in a manner which has traditionally been remedied by ... the law of torts." *Neibarger v. Universal Coops., Inc.,* 439 Mich. 512, 486 N.W.2d 612, 615 (1992). The purpose of the doctrine is to stem not only unlimited liability by limiting parties to the terms of their agreements, but also to serve as a demarcation line between contract and tort. *Public Serv. Enter. Group, Inc. v. Philadelphia Elec. Co.,* 722 F.Supp. 184, 193 (D.N.J.1989). To determine whether the doctrine applies in a particular case, the court must examine the nature of "economic loss."

### 2. *Injuries Constituting Economic Loss*

In *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), the Supreme Court of Illinois stated:

> "Economic loss" has been defined as damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property, as well as the diminution in value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold.

*Id.,* 61 Ill.Dec. at 752, 435 N.E.2d at 449 (citations and internal quotation marks omitted). Similarly, in *Wausau Paper Mills Co. v. Chas. T. Main, Inc.,* 789 F.Supp. 968, 971 (W.D.Wis.1992), the court characterized "eco-

nomic loss" as "failed economic expectations" as opposed to "injuries that can be recovered in a tort action." The Seventh Circuit has correctly noted that the term "economic loss" is merely an artificial, misleading appellation given to damages that do not constitute injury to person or "other property." *See Miller v. United States Steel Corp.*, 902 F.2d 573, 574 (7th Cir.1990). The Supreme Court of Minnesota has stated that "economic loss" is "a useful shorthand phrase in the law of sales for contract damages." *Lloyd F. Smith Co. v. Den–Tal–Ez, Inc.*, 491 N.W.2d 11, 14 n. 5 (Minn.1992). Thus, the remedy for "economic loss" manifests characteristics of the measure of damages contemplated by contract remedies because it attempts to compensate an aggrieved party with the benefit of his bargain. Economic loss is accordingly more properly characterized as "commercial loss," *Miller*, 902 F.2d at 574, because it is loss of a bargained-for product based on a commercial transaction versus loss resulting from physical injury to person or other property[12] because of negligence or strict liability. The calculus of law designed to redress grievances in commercial transactions is contract law because "tort law is a superfluous and inapt tool for resolving purely commercial disputes." *Id.* The courts that have addressed the propriety of applying the doctrine have uniformly held that the circumstances surrounding the events giving rise to the claim must be analyzed to determine whether the transaction concerned sophisticated parties negotiating in a commercial setting or a consumer purchasing a defective or dangerous product. *See, e.g., Laurens Elec. Coop. v. Altec Indus.*, 889 F.2d 1323, 1324–26 (4th Cir.1989); *Wausau Paper Mills Co.*, 789 F.Supp. at 972–74; *Neibarger*, 486 N.W.2d at 615–17; *Hapka v. Paquin Farms*, 458 N.W.2d 683, 687–88 (Minn.1990). The context in which the loss occurred is therefore crucial in determining whether the doctrine applies.

South Carolina has adopted the economic loss doctrine substantially as articulated in *East River:*

> This rule exists to assist in determining whether contract or tort theories are applicable to a given case. Where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic losses." Conversely, where a purchaser buys a product which is defective and physically harms him, his remedy is in either tort or contract. This is so, ... because his losses are more than merely "economic."

*Kennedy v. Columbia Lumber & Mfg. Co.*, 299 S.C. 335, 384 S.E.2d 730, 736 (1989). While adopting the doctrine, the Supreme Court of South Carolina has "also noted [its] difficulty with the economic loss rule generally." *Kershaw County Bd. of Educ. v. United States Gypsum Co.*, 302 S.C. 390, 396 S.E.2d 369, 371 (1990). This "difficulty" has led that court to restrict the doctrine, at least as far as consumer purchasers are concerned, to instances where the parties' duties are solely grounded in contract. *Kennedy*, 384 S.E.2d at 737. The *Kennedy* court did state, however, that "[t]he 'economic loss rule' will still apply where duties are created *solely* by contract. In that situation, no cause of action in negligence will lie." *Id.* In *Beachwalk Villas Condominium Ass'n v. Martin*, 305 S.C. 144, 406 S.E.2d 372 (1991), the court interpreted *Kennedy* to "hold that architects may be held liable to homebuyers for negligence in connection with home construction and breach of implied warranty where no contractual privity exists between the architect and the homebuyer." *Id.*, 406 S.E.2d at 374. South Carolina has only applied the doctrine in consumer transactions regarding houses, and has "not yet been presented with the question of whether the rule should be ... rejected in all contexts, *including the commercial arena.*" *Kershaw*, 396 S.E.2d at 371 (emphasis added). The *Kershaw* court therefore specifically reserved judgment concerning the doctrine's application in a commercial transaction. Thus, South Carolina's highest court has not addressed the issue in the posture that the present action comes before this court, although *Kennedy* stated that provided the parties' duties are grounded solely in contract, no tort claim would lie.

---

**12.** *See* discussion of "other property," *infra* at pp. 1054–62.

*Kennedy, Kershaw,* and *Beachwalk Villas* therefore are of little precedential value with respect to the type of parties and setting as presented here. The Fourth Circuit, however, has addressed South Carolina's economic loss rule in a commercial transaction between merchants in deciding whether a tort claim exists.

### 3. *Purvis, 2000 Watermark, and Laurens*

In *Purvis v. Consolidated Energy Products Co.,* 674 F.2d 217 (4th Cir.1982), *2000 Watermark Ass'n v. Celotex Corp.,* 784 F.2d 1183 (4th Cir.1986), and *Laurens Electric Cooperative v. Altec Industries,* 889 F.2d 1323 (4th Cir.1989), the Fourth Circuit applied South Carolina law in determining whether a tort action could be maintained under South Carolina's economic loss rule. In each instance, the court held that the tort could not proceed because the action sounded exclusively in contract. Given that only a contract action applied, the plaintiffs were relegated solely to contractual remedies, which, because of limitations, had excluded consequential damages. These cases are discussed in turn.

#### a. *Purvis*

Purvis, a tobacco farmer, purchased six specially-built tobacco barns from the defendant because the barns were constructed to improve efficiency. *Purvis,* 674 F.2d at 218. The barns, however, did not satisfactorily cure the tobacco; consequently, Purvis lost money on the barns and his tobacco crop. In an attempt to recover for these losses, Purvis brought a strict products liability claim in addition to his fraud and breach of warranties claims. *Id.* at 219. The district court directed verdicts in favor of the defendant with respect to the fraud and breach claims, but permitted the strict liability claim to go to the jury, which returned a verdict in Purvis's favor. *Id.* The only issue on appeal was whether the strict liability claim could proceed. *Id.*

The Fourth Circuit reversed, concluding that Purvis's losses were only economic losses, and hence "strict products liability does not apply;" thus, he was limited to pursuing exclusively contract claims. *Id.* at 223. Af-

ter discussing the purposes and policies of tort strict liability, the court held that traditional tort policies do not apply to commercial transactions between merchants because such negotiations are governed by the law of contract. *Id.* at 220–23. The court stated that even if warranty law did not fully compensate for physical injury, *id.* at 220, such a calculus of law was the best vehicle for operating in a commercial context because the parties could define their own rights and remedies by what they assented to in their bargain, *id.* at 221. Because Purvis was a commercial plaintiff, he had the power to negotiate with respect to the product's specifications and with respect to the risk of loss due to any possible defects in the product. Purvis's own failure to secure a better bargain was the result of his own conscious choice: "the commercial buyer can protect himself by negotiation.... When a buyer who has taken advantage of that opportunity invokes [tort doctrines] with respect to a risk that was allocated to him by contract, he in effect asks the law to accord him a better bargain than he purchased." *Id.* The court also noted that when the parties have struck a bargain, the duty of the court is to enforce it, including its limitations:

> The right to disclaim warranties and limit remedies enables commercial parties to allocate risks between the buyer and the seller in the most efficient manner and thereby to maximize their respective gains from a transaction. Furthermore, because that right is often embodied in statutory law, failure by the courts to give it due effect would flout a clear legislative mandate.

*Id.* at 222.

With respect to loss, the court held that when loss "results from mere product ineffectiveness, it is the law of contracts and commercial transactions, ... which fixes responsibility for the loss." *Id.* at 223. As applied to Purvis's loss for his crop and barns, his losses were economic because they sprang from a commercial transaction and were the result of "an ordinary commercial risk of product ineffectiveness." *Id.* The losses did not take the action out of contract

and into tort. Accordingly, the court concluded that no tort claim would lie. *Id.*

### b. *2000 Watermark*

In *2000 Watermark,* the defendant installed defective shingles on the plaintiff's roof. *2000 Watermark,* 784 F.2d at 1185. While the court characterized the injury as "economic and aesthetic," *id.,* there was injury to the felt and tar paper underlying the shingles that had to be replaced when the defective shingles were removed, *id.* at 1187.[13] The district court permitted the plaintiff to bring a negligence action. *Id.* at 1184.

Again, the Fourth Circuit, applying South Carolina law, reversed, holding that the plaintiff could not bring a tort claim. *Id.* The pillar on which the court rested its reasoning was the fact that the circumstances giving rise to the injury occurred in a commercial setting and the loss was solely economic; as such, contract law alone set the parameters for any claims:

> If intangible economic loss were actionable under a tort theory, the UCC provisions permitting assignment of risk by means of warranties and disclaimers would be rendered meaningless.... The UCC represents a comprehensive statutory scheme which satisfies the needs of the world of commerce, and courts have been reluctant to extend judicial doctrines that might dislocate the legislative structure.

*Id.* at 1186.

The plaintiff claimed that it did not suffer solely economic injury, but also suffered injury to other property because the felt and tar paper under the shingles had to be replaced when new shingles were installed. *Id.* Thus, plaintiff asserted that it could bring a tort claim because property other than the product had been injured. The court, however, rejected this contention, concluding that this type of injury was contemplated by the contract because the injury was to the product itself; plaintiff simply did not get the benefit of its bargain—i.e.—a leakproof roof. Accordingly, there could be no recovery in tort: "[t]he cost of replacing the old felt is an incidental expense which may be recoverable

in a warranty action, but it will not support an action for negligence," *id.* at 1188. This conclusion was based on a determination by the court that the felt and tar paper would have to be replaced whenever old shingles are removed. *Id.* at 1187–88. Accordingly, the negligence claim could not proceed.

### c. *Laurens*

In *Laurens,* the parties, both commercially sophisticated, contracted for the defendant to make substantial modifications to a derrick and remount it to a truck. *Laurens,* 889 F.2d at 1323–24. While in use, the truck ignited and was destroyed. Significantly, the only injury was to the truck itself. *Id.* at 1326. The plaintiff brought claims for both negligence and strict liability, but the district court granted the defendant's motion for a directed verdict in light of *Purvis.* *Id.* at 1325.

Concluding that the plaintiff could not assert these tort claims, the Fourth Circuit affirmed. *Id.* at 1323. The *Laurens* court commenced its discussion by recognizing that the impetus behind strict products liability law "was born out of concern for the *individual consumer,*" but that this rule did not enjoy "universal application in a commercial world." *Id.* at 1324 (emphasis added). Indeed, the court noted that typically in commercial transactions where the parties are commercial entities with the "ability to provide self-protection," *id.* at 1326, the parties may freely allocate risk of loss, *id.* at 1324. The court then noted that application of strict products liability was a fluid concept that created room "for carefully fashioned judicial exceptions and limitations." *Id.* The court then proceeded to discuss Purvis, recognizing, however, that the analogy to Purvis was "not perfect" because in *Purvis* the defective barns "could not be made to function as intended," while in *Laurens,* the product was actually destroyed. *Id.* at 1325. The court then noted that while South Carolina had not addressed the applicability of economic loss when the only injury was to the product itself, the court recognized that *East River* had resolved this issue by holding that "in such situations tort principles were

---

**13.** Although the *2000 Watermark* court did not characterize this as a "component part" case, undoubtedly because it preceded *East River,* this court considers *2000 Watermark* just such a suit.

simply inapplicable, and the result should be determined by resort to contract law." *Id.* Based on *East River*, the *Laurens* court held that no tort action could be maintained since the loss was exclusively economic because the only property of the plaintiff that had been injured was the product itself, and the actions giving rise to this injury germinated from a commercial transaction between two sophisticated corporations. *Id.* at 1326.

*Purvis, 2000 Watermark,* and *Laurens* can generally be traced to the much-followed *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965),[14] in which the Supreme Court of California denied tort recovery to the plaintiff because the injury sustained was only to the product itself. The *Seely* court noted that where no other injury is sustained, tort law does not apply:

> The law of sales has been carefully articulated to govern the economic relations between suppliers and consumers of goods. The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of … the Uniform Commercial Code but, rather, to govern the distinct problem of physical injuries.
>
> ….
>
> [T]he rules governing warranties … meet the needs of commercial transactions.

*Id.*, 45 Cal.Rptr. at 21, 403 P.2d at 149 (internal quotation marks omitted). As a subsequent California court held: "[T]he doctrine of products liability does not apply as between parties who: (1) deal in a commercial setting; (2) from positions of relatively equal economic strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in it." *Kaiser Steel Corp. v. Westinghouse Elec. Corp.*, 55 Cal.App.3d 737, 127 Cal.Rptr. 838,

845 (1976), *superseded by statute on procedural grounds as stated in Elston v. City of Turlock*, 148 Cal.App.3d 23, 195 Cal.Rptr. 618 (1983).

▆ Applying the principles of *Purvis*,[15] *2000 Watermark,* and *Laurens,* the court concludes that Myrtle Beach may not maintain its negligence action. Initially, the court observes that a recurrent theme throughout these cases, and indeed, the economic loss doctrine generally, is that if sophisticated parties to a commercial transaction have negotiated a contract, as here, and the product injures only itself and not other property belonging to the plaintiff, also as here, contract law, specifically the Uniform Commercial Code, and not tort law, provides the exclusive rights and remedies of the parties. *See Miller,* 902 F.2d at 574 (stating that "tort law is a superfluous and inapt tool for resolving purely commercial disputes"). Here, both Myrtle Beach and Emerson are corporate entities that are able to protect their own interests. Moreover, the circumstances giving rise to this action were purely commercial—a specially-designed product was manufactured and sold by one merchant to another; no consumers and no personal injuries were involved. The case therefore does not have paradigmatic features of a tort. *See Agristor Leasing v. Meuli,* 634 F.Supp. 1208, 1217 (D.Kan.1986) (holding that no tort claim would lie because the parties had a contract defining their duties and because the "[the injury] did not involve the sudden, violent, or accidental damage to a person or property—the type of damage most often associated with tort remedies.") (citation omitted). Under *Seely* and *Kaiser Steel Corp.,* no tort claim lies: (1) this is a commercial transaction; (2) the parties have relatively equal bargaining power; (3) the air eliminator was specially designed at Myrtle Beach's instruc-

---

**14.** The *2000 Watermark* and *Purvis* courts both relied on *Seely* for their reasoning, as did the Supreme Court in *East River.*

**15.** While the *Purvis* plaintiff brought a strict products liability claim, as opposed to a negligence claim, the *Laurens* plaintiff asserted both strict products liability and negligence claims, even though the *Laurens* court devoted its discussion to strict liability. That Myrtle Beach is

bringing a negligence claim does not render *Purvis* inapplicable because the same principles that apply to strict products liability also apply to negligence. *See Chicago Heights Venture v. Dynamit Nobel of America, Inc.,* 782 F.2d 723, 728 n. 7 (7th Cir.1986). Myrtle Beach's putative tort claim also falls within the ambit of *Laurens* because both types of claims were brought in that case.

tions; and (4) the parties had a contract that allocated their risk of loss.

South Carolina law has long recognized the principle that no tort claim will lie where the parties' duties are defined by a contract. *See, e.g., Meddin v. Southern Ry.-Carolina Div.*, 218 S.C. 155, 62 S.E.2d 109, 112 (1950) ("[I]f the cause of action is predicated on the alleged breach, or even negligent breach, of a contract between the parties, an action in tort will not lie."); *Foxfire Village, Inc. v. Black & Veatch, Inc.*, 304 S.C. 366, 404 S.E.2d 912, 917 (Ct.App.1991) (same). If Myrtle Beach could bring its tort action, the Uniform Commercial Code would be totally eviscerated, and the action of the General Assembly of South Carolina in enacting it would be rendered nugatory. *See 2000 Watermark*, 784 F.2d at 1186; *Purvis*, 674 F.2d at 222; *Neibarger*, 486 N.W.2d at 618; *Hapka*, 458 N.W.2d at 687–88. Moreover, permitting Myrtle Beach to prosecute its negligence claim would undermine the objective of *East River* that the parties receive the benefit of their bargain. Being barred from asserting the negligence claim, Myrtle Beach is not entitled to any damages it claims would flow as a proximate result from a tort. Rather, as discussed above, Myrtle Beach is limited to its contractual remedies. *See Neibarger*, 486 N.W.2d at 618 ("[W]here a plaintiff seeks to recover for economic loss caused by a defective product purchased for commercial purposes, the exclusive remedy is provided by the UCC...."); *Hapka*, 458 N.W.2d at 688 ("[T]here is no ... reason in cases of property damage arising out of commercial transactions to heap tort theories of negligence and strict products liability atop those remedies already provided by the U.C.C."). Stripped to its essentials, this action is merely a contract for the sale of goods, and thus the law of warranty applies. By enacting the Uniform Commercial Code,

the General Assembly has recognized that warranty law, not tort law, "function[s] well in a commercial setting." *Seely*, 403 P.2d at 150. The integrity of contract must be maintained, or contract law will "drown in a sea of tort." *East River*, 476 U.S. at 866, 106 S.Ct. at 2300 (citing Grant Gilmore, *The Death of Contract* 87–94 (1974)). The court must be vigilant in preventing the "inevitable efforts of lawyers to turn every breach of contract into a tort." *Iron Mountain Sec. Storage Corp. v. American Specialty Foods*, 457 F.Supp. 1158, 1165 (E.D.Pa.1978) (citation and internal quotation marks omitted).

The *Purvis* court held that the plaintiff could not recover for his imperfectly cured tobacco and the barns because these losses were an "ordinary business risk" of a commercial transaction based on a product that did not work as represented, rather than on a product that was inherently dangerous.[16] The crux of this holding appeared to be that the losses to the tobacco and the barn were within the purview of the negotiations and reasonably foreseeable by the parties. Because they were contemplated by the contract, the losses were necessarily "economic." Similarly, in *2000 Watermark*, the court concluded that damages for the cost of replacing felt and tar paper under defective shingles constituted incidental contract damages that were recoverable under a warranty theory, not consequential tort damages. Here, because the contract between the parties allocated the risk of loss to Myrtle Beach, tort doctrines provide no justification for the court's shifting the loss to Emerson.

As the *Public Service* court observed in resolving whether a tort action could proceed between two sophisticated parties:

> [W]e think, quite candidly, that [defendant] is quite right in suggesting that, at its core, this is a contract action. Asking two

---

**16.** The *Purvis* court noted in dicta that "[a]rguably[ ] the doctrine of strict products liability would override the contract if the defect which allegedly caused plaintiff's injury invoked the policies of that doctrine. [But] [t]hose policies have no role in this dispute, for the alleged defect ... was not unreasonably dangerous to plaintiff or his property." *Purvis*, 674 F.2d at 223. Likewise here, the alleged defect in the air eliminator is simply not an unreasonably dangerous prod-

uct. Moreover, the *Laurens* court foreclosed this possible opening in *Purvis* by noting that provided that the claim is solely for economic loss, "it [is] irrelevant whether the destruction occurred in a calamitous event and the extent of the product's dangerousness...." *Laurens*, 889 F.2d at 1325. *See also East River*, 476 U.S. at 869–70, 106 S.Ct. at 2301–02 (rejecting the "dangerous" versus "disappointed" distinction).

questions helped us reach this conclusion: (1) what is the nature of the loss suffered by the plaintiffs? and (2) from what source did the defendant's duty to refrain from the conduct complained of primarily derive?

*Public Serv.*, 722 F.Supp. at 184. *See also Theuerkauf v. United Vaccines Div. of Harlan Sprague Dawley, Inc.*, 821 F.Supp. 1238, 1241 (W.D.Mich.1993) (holding that the economic loss doctrine precluded plaintiff's tort claim "because the dispute . . . is in essence a contractual dispute in which the damage arose out of the commercial sale of goods"). Like the *Public Service* and *Theuerkauf* courts, this court also concludes that "at its core" this is a contract action seeking damages for economic loss based on a commercial transaction. Answering the *Public Service* questions, the loss is economic because no property belonging to Myrtle Beach other than the air eliminator was injured; and the duties between the parties were governed by a contract. Here, Myrtle Beach's losses are for tangential expenses that grew out of a contract in which it bore the risk of loss. Hence, the nature of the loss sustained, the sophistication of the parties, and the circumstances surrounding the transaction compel that the tort claim be precluded. The trend in the law is that commercial parties, by the terms of their contract, may freely allocate their risks of purely economic loss because of defective products. *See generally* William K. Jones, *Product Defects Causing Commercial Loss: The Ascendancy of Contract over Tort*, 44 Miami L.Rev. 731 (1990).

A more difficult issue is classification of the loss, but the court holds that the type of loss here is economic because the only property belonging to Myrtle Beach that was injured was the air eliminator proper—there was no injury to other property of Myrtle Beach. In all of the above precedents, the plaintiff owned the other property that was injured by the defective product. Such is not the case here. A critical matter is that the

injury for which Myrtle Beach seeks compensation is with respect to property that Myrtle Beach does not own.[17] The "other property" belongs to the United States. Myrtle Beach does not address this fact but asserts that it is the party who bears the consequences of the spill because it must clean up the Base. Emerson contends that there was no injury to any property owned by Myrtle Beach other than the air eliminator. Precedentially, therefore, Myrtle Beach is in a tenuous position for asserting its claims.

The court believes that Myrtle Beach's lack of ownership of the injured realty casts grave doubts on whether Myrtle Beach may recover the damages it claims. Indeed, the decisional law reveals that the plaintiff seeking economic loss must also be the same party who actually suffered personal injury or injury to his other property. *See, e.g., Laurens Elec. Coop.*, 889 F.2d at 1323 (The product was "*owned by* Laurens Electric.") (emphasis added); *Purvis*, 674 F.2d at 218 (The plaintiff "*owned* and operated a farm," and he "*purchased* the barns.") (emphasis added); *Neibarger*, 486 N.W.2d at 613 (The plaintiff was the "*owner* and operator" of the farm.) (emphasis added). For example, in *Cooley*, the court held that before recovery in tort was available to a plaintiff pleading breach of implied warranty and strict liability, the plaintiff had to allege "damages to *themselves*, in the nature of personal injury, [or] to *their other property.*" *Cooley*, 383 F.Supp. at 1119 (emphasis added in part). Similarly, in *Held v. Mitsubishi Aircraft International, Inc.*, 672 F.Supp. 369, 376–77 (D.Minn.1987), the court ruled, with respect to products liability claims, that the party seeking recovery for economic loss must also own the other property that was allegedly injured. In *Held* five passengers were killed, and the plane was destroyed allegedly because it was defective. *Id.* at 372. The plaintiff claimed that because that there were five deaths as well as destruction of the product, the otherwise economic loss of the

---

**17.** By letter dated October 15, 1993 (approximately five weeks after the motion for partial summary judgment was argued), Myrtle Beach stated that it has an easement to be on the Base; and a copy of the document granting the easement was provided to the court. The easement,

however, does not change the result of this opinion. The Supreme Court of South Carolina has held that easements are minor property rights that do not confer standing to sue. *See Quinn v. City of Columbia*, 303 S.C. 405, 401 S.E.2d 165, 167 n. 2 (1991) (per curiam).

plane was converted into a loss recoverable in tort. *Id.* at 376. The court, however, rejected this contention, holding that a claim for economic loss would not support recovery in a strict liability claim merely "because of the fact that third parties were injured as a result of the product's defect." *Id.* The *Held* court noted the "emphasis on ownership" that was required to sustain a products liability claim. *Id.* at 377.[18] *See also Carolina Winds Owners' Ass'n v. Joe Harden Builder, Inc.,* 297 S.C. 74, 374 S.E.2d 897, 901 (Ct.App.1988) ("The [economic loss] rule states that an action will not lie in tort for a product defect without a claim of injury to the person or other property *of the plaintiff.*") (emphasis added), *disapproved on other grounds by Kennedy v. Columbia Lumber & Mfg.,* 299 S.C. 335, 384 S.E.2d 730, 734–36 (1989), and *overruling recognized by Beachwalk Villas Condominium Ass'n v. Martin,* 305 S.C. 144, 406 S.E.2d 372 (1991). This court therefore concludes that one of the requisites to support tort recovery is ownership of distinct, other property that was allegedly injured as a result of the bargained-for product.

The court is urged to follow *Tourist Village Motel, Inc. v. Massachusetts Engineering Co.,* 801 F.Supp. 903 (D.N.H.1992), to hold Emerson liable for the spill. *Tourist Village,* however, is distinguishable from this action for the very reasons stated above—i.e.—the plaintiff in *Tourist Village* owned the property that was contaminated because of the leak in the fuel drum. *Id.* at 907. Thus, *Tourist Village* is not contrary to the instant holding. Moreover, *Tourist Village* provides no analysis for its holding, so determining its applicability and precedential value to the instant case is difficult to assess.

Myrtle Beach contends that *City of Greenville v. W.R. Grace & Co.,* 827 F.2d 975 (4th Cir.1987), controls disposition of this action. While *City of Greenville* is not contrary to *Purvis, 2000 Watermark,* and *Laurens,* but rather comports with those cases, *City of Greenville* is materially distinguishable from the instant action. First, in *City of Green-*

*ville,* the plaintiff owned the property at issue, *see id.* at 976–78, while in the present action, Myrtle Beach does not own the other injured property. Second, the defendant in *City of Greenville* knowingly sold a dangerous product to an unknowing plaintiff. *See id.* at 978–82. In the present action, Emerson did not knowingly sell a product that was innately dangerous. Both parties were on an equal footing with regard to their knowledge of the air eliminator. Third, the product at issue in *City of Greenville* contained asbestos, a patently harmful, toxic substance; thus, the product was inherently dangerous and defective. *See id.* at 977–78. As contrasted here, there is nothing inherently dangerous about an air eliminator. Fourth, the types of injuries in *City of Greenville* were grave personal injuries. *See id.* at 978. Conversely, here there is no claim for personal injury. Fifth, the *City of Greenville* court concluded that the parties would not have allocated the type of risk of loss that was sustained. *See id.* at 977–78. In the case at bar, however, there was such an allocation, and it was placed with Myrtle Beach: the contract clearly stated that the limited remedy of repair or replacement was the sole remedy available to Myrtle Beach. That a spill would occur was possible, and the contract allocated this risk to Myrtle Beach. Finally, the *City of Greenville* court did not paint with a broad brush, but rather decided the case based on the facts particular to it. *See id.* at 977. *City of Greenville* therefore is very different from the instant action.

In light of the above, the court concludes that no tort claim exists. Accordingly, summary judgment is granted in favor of Emerson with respect to Myrtle Beach's negligence action.

### 4. *"Other Property"*

Although the court concludes that a tort claim will not lie, and that the above holding is dispositive of this issue, the court will nevertheless address the issue of the

---

18. *Held,* however, permitted the plaintiff to recover under a negligence theory; but the court, applying Texas law, noted that Texas law represented a minority view. *Id.* at 377. The *Held*

court further observed that Texas precedents are somewhat confused on this issue. *Id.* This court does not believe that South Carolina would adopt the minority view followed in Texas.

"other property" exception. An emerging trend in the decisional law, as discussed below, is that the "other property" exception is not met if: (1) "other property" and (2) injury to this "other property," even if owned by a plaintiff, were, or should have been, contemplated by the contract.

Myrtle Beach asserts that it may maintain its negligence claim because the air eliminator injured the surrounding real property, for which Myrtle Beach incurred substantial clean up costs and litigation expenses. Myrtle Beach advances this contention even though it does not own any other injured property. Emerson contends that *East River* applies because the sole injury was to the product itself—i.e.—the air eliminator ruptured; hence, the tort claim is precluded because no "other property" belonging to Myrtle Beach was injured. Emerson further argues that Myrtle Beach's attempts to recover clean up costs and litigation expenses are the very types of economic loss that the economic loss doctrine bars. The injury to the real property here raises the issue not specifically addressed in *East River* of whether injury to "other property" caused by a defective product is in all circumstances recoverable.

In *East River*, the Court prohibited recovery for "the failure of [a] product to function properly," unless "the defective product damages other property." *Id.*, 476 U.S. at 867–68, 106 S.Ct. at 2300. The Court, however, provided no insights as to what constitutes "other property" or how it is to be distinguished from the product proper. This distinction is not academic because *East River* precludes a tort action only when the product itself is injured. *See also Laurens*, 889 F.2d at 1326 (noting that only the product itself was destroyed because of its alleged defect). Conversely, tort recovery may be had when "other property" is injured as a result of the defect.

There is a dearth of case law addressing the precise issue presented here. Most of the law addressing the issue of what constitutes "other property" is concerned with whether the other property is merely a component part of the overall product itself. If such is the case, then the courts uniformly

hold that the economic loss doctrine precludes recovery in tort against the manufacturer of the component because the component is integrated into the whole product and the purchaser bargained for the whole product, not merely a component of it. *See, e.g., Laurens*, 889 F.2d at 1325 (holding that a defective derrick mounted to a truck is a single, integrated product for purposes of the economic loss doctrine); *King v. Hilton–Davis*, 855 F.2d 1047, 1051–54 & n. 4 (3d Cir.1988) (holding that potatoes treated with a chemical that inhibits premature sprouting are a single product, not separate components of potatoes and chemicals and thus plaintiff's tort claim was precluded by the economic loss doctrine), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 839, 102 L.Ed.2d 971 (1989); *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 929–30 (5th Cir.1987) (holding that "product" as contemplated under *East River* means "finished product" and thus plaintiff could not maintain a tort action against manufacturer of the product proper or manufacturer of a defective component integrated into the product), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988); *American Home Assurance Co. v. Major Tool & Machine, Inc.*, 767 F.2d 446, 448 (8th Cir.1985) (holding that "other property" does not include parts of a single product that is composed of various components and therefore a turbine assembler was barred by the economic loss doctrine from recovering in tort against manufacturers of defective component parts of the turbine). Here, there is no complaint that a component part caused the destruction of the overall product or that the product as a whole destroyed itself because of faulty component parts. Rather, the claim for damages is that the product itself injured surrounding real property giving rise to clean up costs and litigation expenses.

In determining whether "other property" has been injured for purposes of the economic loss rule, the courts have tended to focus on the circumstances and context giving rise to the injury. *See, e.g., Chicago Heights Venture v. Dynamit Nobel of America, Inc.*, 782 F.2d 723, 728 (7th Cir.1986) ("[R]ecovery for economic losses does not focus on a par-

ticular type of damage, so much as it identifies harm originating from a particular context, the commercial context wherein harm is to a consumer's commercial expectation."); *Agristor Leasing v. Guggisberg,* 617 F.Supp. 902, 908 (D.Minn.1985) ("[O]ther courts have focused not on whether damage has occurred to 'other property,' but instead on the nature of the defect and the manner in which the damage occurred."); *Kennedy,* 384 S.E.2d at 737 ("The framework we adopt focuses on activity, not consequences."). This approach "requires consideration of the underlying policies of tort and contract law as well as the nature of the damages." *Neibarger,* 486 N.W.2d at 620. Under this approach, the court must examine the nature of the parties and the predicate underlying the injury. Material to this inquiry is whether the parties were commercially sophisticated and whether the injury sprang from a commercial transaction or whether a party was an individual consumer and the injury resulted from tortious behavior. *See id.; Theuerkauf,* 821 F.Supp. at 1241. Various courts have concluded that if the context is a commercial transaction, the economic loss doctrine precludes recovery for injury to "other property" if the injury were, or should have been, reasonably contemplated by the parties to the contract. *King,* 855 F.2d at 1051; *Citizens Ins. Co. of America v. Proctor & Schwartz, Inc.,* 802 F.Supp. 133, 140 (W.D.Mich.1992); *Public Serv.,* 722 F.Supp. at 195; *Neibarger,* 486 N.W.2d at 620.

Some courts, however, will permit recovery in tort, even if the context is primarily commercial, if the injury were "sudden and calamitous," *see, e.g., Star Furniture Co. v. Pulaski Furniture Co.,* 171 W.Va. 79, 297 S.E.2d 854, 860–61 (1982), while other courts have not, *see, e.g., S.M. Wilson & Co.,* 587 F.2d at 1376. The Fourth Circuit has rejected any distinction in the dynamics of the injury, stating that "[i]t seems of no moment that the kind of injury is suffered in a sudden calamity or more slowly and less dramatically." *Laurens,* 889 F.2d at 1325.[19] The *Laurens* court noted that the action is a breach, *id.,* and "to confuse such a breach as an accident is to confuse disappointment with

disaster," *S.M. Wilson,* 587 F.2d at 1376. Disappointment has been held to occur when the "economic loss is a natural, foreseeable result of the product's defect...." *Citizens Ins. Co.,* 802 F.Supp. at 140. The court now examines some decisional law applying these precepts to "other property."

Cattle loom large in applying the economic loss doctrine to the concept of "other property." In *Neibarger,* Neibarger, who operated a dairy farm, contracted to purchase a milking system from the defendant. *Neibarger,* 486 N.W.2d at 613. Concluding that the milking system was defective, Neibarger sued for breach of warranties and negligence. *Id.* Neibarger asserted that he could maintain his tort action despite the economic loss doctrine because he suffered injury to other property in addition to the defective system, *id.* at 619: some of his cattle died, some became gravely ill, and the herd had a decreased milk production, *id.* at 613. Neibarger contended that these losses constituted injury to "other property" and thus recovery for such injury was compensable in tort. The Supreme Court of Michigan, however, rejected this contention, holding that these losses were economic losses, "not withstanding injury to the ... herd." *Id.* at 619. The court premised its holding on the fact that this was a commercial transaction between two sophisticated parties and that the gravamen of the complaint was that the milking system was of a lesser quality than warranted. *Id.* Because Neibarger's loss was the result of this lesser quality, his damages were nothing more than "lost profits and consequential damages, losses which are compensable under the UCC, [and] [t]hus, these actions fall squarely within the economic loss doctrine...." *Id.* at 621. When so viewed, the loss was nothing more than a commercial loss in which Neibarger had borne the risk.

In examining the relationship of injury to the product proper and injury to "other property," the court observed:

In many cases, failure of the product to perform as expected will necessarily cause damage to other property; such damage is often not beyond the contemplation of the

---

**19.** *See* n. 16 *supra* at 1054.

parties to the agreement. Damage to property, where it is the result of a commercial transaction otherwise within the ambit of the UCC, would not preclude application of the economic loss doctrine where such property damage necessarily results from the delivery of a product of poor quality.

*Id.* at 620 (footnote omitted). Under *Neibarger* therefore, injury to the product itself cannot be completely divorced from possible injury to other property because poor product performance "will necessarily cause" injury to other property. The *East River* Court noted that virtually all machines have component parts and to distinguish the component part from the whole would result in a finding of injury to "other property" whenever a product injures itself. *See East River,* 476 U.S. at 867, 106 S.Ct. at 2300 (citing *Northern Power & Eng'g Corp. v. Caterpillar Tractor Co.,* 623 P.2d 324, 330 (Alaska 1981)). Obviously, a material factor enunciated by the courts in determining whether other property has been injured is whether the defect was such a risk as would be encompassed in a commercial transaction as contemplated by the Uniform Commercial Code.

Similar to *Neibarger* is *Agristor Leasing,* in which the Guggisbergs, farmers, purchased a defective silo system from the defendants. *Agristor Leasing,* 617 F.Supp. at 904. As a result of the defect, the Guggisbergs' stored grain became spoiled, which, in turn, injured their herd of cattle. *Id.* at 907. The Guggisbergs sued under theories of strict liability and negligence as well as breach of warranties, contending that they were not barred by the economic loss doctrine from recovering for the injury to their grain and cattle because these injuries constituted "other property." *Id.* The court noted, however, that "[t]he essence of their complaint is that the [silo system] failed to perform as expected," and thus the Guggisbergs actually sought "the benefit of their bargain." *Id.* at 908. Because the Guggisbergs' loss was contemplated by their contract, the court rejected their contention, holding "as a matter of law that the alleged damage to the alfalfa feed and the Holstein cows is non-recoverable economic loss." *Id.* Conspicuously, the *Agristor Leasing* court

stated that its "result is further supported by the holding of the court in *Purvis....*" *Id.* at n. 4. The Guggisbergs losses, because they were a risk of loss that germinated from a commercial transaction and were within contemplation of the contract, did not constitute "other property" for purposes of the economic loss doctrine. *See also Meuli,* 634 F.Supp. at 1217–18 (holding that injury to cattle via injury to seed, where the seed became defective by virtue of being stored in a defective silo, were "economic losses and therefore were nonrecoverable under any tort theory" and thus plaintiffs were limited to any contractual remedies under the Uniform Commercial Code).

Elaborating on risks contemplated by the commercial transactions is *Theuerkauf.* Theuerkauf operated a mink ranch, and contracted with the defendant to inoculate his minks with the BIOCOM–DP vaccine, a vaccine that "[t]he defendant manufactures, tests, and distributes." *Theuerkauf,* 821 F.Supp. at 1239. The vaccine was represented to prevent various diseases afflicting minks. *Id.* Unfortunately, approximately 2,000 minks died as a result of vaccination; so Theuerkauf brought negligence, fraud, and breach of warranty claims against the defendant. *Id.* Theuerkauf asserted that the economic loss doctrine did not bar his tort claims because the mink were "other property" for which a tort claim would lie. *Id.* at 1241. The court, noting that both parties "operated businesses" and that Theuerkauf was "not an ordinary consumer," held that the losses were economic "because the dispute ... is in essence a contractual dispute in which the damage arose out of the commercial sale of goods." *Id.*

The *Theuerkauf* court concluded that the economic loss doctrine barred recovery for the minks, "even though the damage claimed by the plaintiff occurred to property other than the product itself." *Id.* at 1242. This is application of *Neibarger's* position that injury to the product is often not strictly confined to the product's destruction. Here, the loss was an unfortunate, but natural and foreseeable consequence of a product's failure:

The harmful effect to animals injected with a vaccine is without a doubt a necessary result which would occur from the delivery of a defective vaccine. The vaccine is intended to be injected into the animals, and one of the inherent risks of the use of vaccines is that the vaccine will cause an adverse reaction resulting in harm. The link between product and harm caused does not require one to stretch one's imagination to reach some tangential nexus—it is the exact damage one would expect from a defective vaccine. Allocation of this damage clearly could have been negotiated by the parties. That is, the death of the mink was a natural, foreseeable result of the product's defect.

*Id.* (citation and internal quotation marks omitted). Under *Neibarger, Agristor Leasing,* and *Theuerkauf,* a rule appears to be emerging that in a commercial transaction between two equal parties, loss to property belonging to the plaintiff flowing from a product or service within the contract's contemplation and reasonably foreseeable as a result should the product or service prove defective will not support recovery in tort because injury to such property is contemplated, or should have been, by the parties to the agreement. As a corollary therefore, the term "other property" appears to be subject to the construction that it is property belonging to the plaintiff the risk to which is outside the reasonable contemplation of the contract.

In *Neibarger, Agristor Leasing,* and *Theuerkauf,* the injury was to personalty, not, as here, realty. In *Ringer v. Agway, Inc.,* 13 U.C.C.Rep.Serv.2d 114, 1990 WL 112091 (E.D.Pa.1990), however, the injury to "other property" was both to personal property and real property. Ringer, a farmer who operated a "small family run farm[ ]," purchased, and ultimately planted, seed potatoes from the defendant. 1990 WL 112091, at *1. By harvest, the potatoes had failed to mature; and investigation revealed that the seed potatoes were infected with ringrot. *Id.* As a result, Ringer "lost the majority of [his] potato crop yield for [the year]." *Id.* Loss of the crop, however, was not the only loss: the disease infected the machinery used to process and plant the seed potatoes, as well

as the land in which the diseased seed potatoes were planted. *Id.* Because of this contagion, Ringer expended "extensive" measures in ridding his machinery and real property of the disease. *Id.* Ringer then sued in tort, claiming that he sustained injury to "other property" because the defective seed potatoes injured his machinery and his realty. Ringer contended that the economic loss doctrine did not bar recovery for these injuries because they clearly fell outside the ambit of the doctrine because his contract for seed potatoes did not contemplate machinery or realty. *Id.* at *5.

Concluding that these losses, grave though they were, were the result of "disappointed commercial expectations" and thus "purely economic," the court held that these injuries did not constitute injury to "other property." *Id.* Accordingly, the economic loss doctrine precluded recovery:

> [T]his form of loss, contrary to [Ringer's] contention, is wholly commercial in nature and will not be recognized as "other property." These unfortunate losses were an ordinary commercial risk of a transaction in the potato industry. Other courts have consistently held that those aspects of damage which involve items or facilities obviously involving the bargain between the parties is not damage to "other property."
>
> . . . .
>
> I conclude that [Ringer] cannot state a cause of action under either negligence or strict liability theories. The damage sustained by [Ringer] falls within the scope of the bargain with [the defendant], and is properly addressed through contractual theories of recovery only.

*Id.* at 5–6 (citations omitted). Under *Ringer,* property, real or personal, that can reasonably be expected to be affected by the use of the product is contemplated by the contract and thus does not constitute "other property" for purposes of the economic loss doctrine. *See also Chicago Heights Venture,* 782 F.2d at 729–30 (holding that plaintiff could not recover for injury to real property sustained as a result of a defective roof's causing wind and water damage and rejecting plaintiff's

contention that it sustained injury to "other property" because the "gravamen of the complaint ... is that the roof did not work").

In *Public Service,* the defendants contracted to maintain a nuclear power plant for the plaintiffs. The plant, however, proved unsafe; so it was closed by the Nuclear Regulatory Commission. *Public Serv.,* 722 F.Supp. at 186–87. The plaintiffs sought recovery for the shutdown and physical deterioration of the plant, claiming that the defendant's "failures ... caused them hundreds of millions of dollars in damages." *Id.* at 190. Among other injuries, the plaintiffs claimed "maintenance costs," "expenditures to clean up and repair portions of the plant," and "other costs associated with the shutdown." *Id.* Thus, the plaintiffs specifically sought compensation for injury to the site on which the plant was situated. The defendant claimed that the economic loss doctrine barred recovery for physical injury to the plant because the injury did not meet the other property exception of the doctrine. *Id.* at 201–02.

Although ultimately denying defendants' motion to dismiss the tort claims, *id.* at 220, the court nevertheless stated that it "would be inclined to hold that this is simply a contract case," *id.* at 211. The court further stated that "the harm suffered by the plaintiffs has been predominately economic in nature." *Id.* at 208. With respect to the physical injury to the plant site, the court stated that this did not meet the other property exception of the economic loss doctrine:

> And while it is true that plaintiffs allege that the ... plant was physically damaged because of [defendant's] failure to maintain it, *East River* ... make[s] clear that such damage in and of itself need not necessarily determine whether a tort remedy is available.... In short, plaintiffs bargained for a well-maintained plant.

As such, we find it analytically difficult to distinguish between such property damage and damage to a defective product itself. Here, plaintiffs bargained for a well-maintained nuclear plant. They allege that it was poorly maintained and suffered physical damage, i.e., they lost the benefit of their bargain.

*Id.* at 209. Material to the court's reasoning was the fact that "this case rationally and logically can be viewed as a contract case." *Id.*

Based on the above precedents, the emerging view in the decisional law appears to be that the losses for which Myrtle Beach seeks compensation are non-recoverable economic losses. Here, the losses are for clean up costs and litigation expenses. Under *Neibarger, Agristor Leasing,* and *Theuerkauf,* these losses were a foreseeable result because that a spill would occur is natural if the air eliminator proved defective. Being a contemplated risk, these cases would hold that Myrtle Beach bore this risk because the parties allocated the risk of loss to the purchaser. For similar reasons, Myrtle Beach also cannot bring itself within the "other property" exception because, under *Neibarger* and *Theuerkauf,* that the defective product will necessarily injure other property is often a natural consequence of the product's injury to itself. As *Theuerkauf* noted, that a spill would result for which Myrtle Beach would be liable simply does not "stretch one's imagination" as being outside the purview of the contract. Additionally, *Ringer* held that clean up costs for injury to realty could not be recovered in tort under the economic loss doctrine because use of the real property was contemplated by the contract. *Public Service* also noted the preclusion for clean up costs for physical injury to a plant site. Similarly, *Chicago Heights* held that recovery for injury to realty could not be had where the injury was the result of a defective product that was the subject of a contract. Under these cases, therefore, Myrtle Beach could not recover its clean up costs from Emerson. Indeed, *Public Service* demonstrates that even under extremely compelling circumstances—i.e.—nuclear mishap and over $70 million in damages for injury—Myrtle Beach could not recover its claimed losses.

The possibility of a "public policy exception" regarding possible land contamination has been raised. *Public Service* appears to foreclose any such argument, however, because that court made no such exception, and the circumstances of that action appear far more compelling than those pre-

sented here. The *Public Service* court also noted that there was authority for the proposition that no such exception exists. *See Public Serv.*, 722 F.Supp. at 197 (citing authorities); *see also Garweth Corp. v. Boston Edison Co.*, 415 Mass. 303, 613 N.E.2d 92, 94 (1993) (rejecting plaintiff's contention "that, because this is a contamination case, the economic loss rule is inapplicable"). Additionally, there is no authority, and indeed the court has been provided none, for this court to create such an exception. Such policy considerations are best addressed to the legislative, not judicial, branch of the Government.

Myrtle Beach contends that S.C.Code Ann. sections 48-1-90, 48-43-560 (Law.Co-op. 1976), operate to impose liability on Emerson because these sections require Myrtle Beach to clean up the spill. While the statutes require Myrtle Beach to perform the clean up, they do not impose liability on Emerson because these statutes assume liability. In the instant case, the court has concluded that no tort claim lies against Emerson. Reliance on the statute is misplaced because the argument never reaches the point at which liability attaches to Emerson.

▪▪▪▪ With respect to litigation expenses, these would also appear to be "economic losses." With respect to attorneys' fees, the "American rule" provides that with limited exceptions, each party to litigation must bear his own expenses, regardless of what party prevailed at trial. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 249–59, 95 S.Ct. 1612, 1618–22, 44 L.Ed.2d 141 (1975). In *Alyeska*, the Court noted:

> In 1796, this Court appears to have ruled that the Judiciary itself would not create a general rule, independent of any statute, allowing awards of attorneys' fees in federal courts. In *Arcambel [v. Wiseman*, 3 U.S. (3 Dall) 306, 1 L.Ed. 613 (1796)] ..., *the inclusion of attorneys' fees as damages was overturned* on the ground

that the general practice of the United States is in [opposition] to it; and even if that practice were not strictly correct in principle, it is entitled to the respect of the court, till it is changed, or modified, by statute. This Court has consistently adhered to that early holding.

*Id.* (emphasis added) (internal quotation marks omitted). Under *Alyeska* therefore, attorneys' fees are not considered part of the general calculus of a prevailing party's damages award; thus, unless modified by statute or judicial exception, attorneys' fees do not generally constitute damages. *See also Brooks v. Cook*, 938 F.2d 1048, 1051 (9th Cir.1991) ("The jury's role is to determine liability and the amount of damages. These determinations are *distinct from the awarding of fees.*") (emphasis added). With respect to other monies paid by Myrtle Beach, these payments are not compensable loss because payment to third parties does not "convert[ ] otherwise pure economic loss ... into a property loss recoverable in tort." *See Held*, 672 F.Supp. at 375–76 (denying recovery of $130,000.00 to plaintiff against defendant where plaintiff had paid this sum in settlement to the estate of the victim of a plane crash).[20]

Myrtle Beach maintains that it is entitled to summary judgment with respect to other issues raised in the cross-motions for partial summary judgment: (1) that it was not contributorily negligent because the sole cause of the rupture was the defective weld; (2) that it did not assume the risk of loss; and (3) that it failed to avoid consequences or mitigate injury. In light of the above rulings regarding the disclaimer, limitation and exclusion of consequential damages, and the disallowance of a tort claim, these contentions are rendered inapplicable. Consequently, the court does not address these issues.

---

**20.** This is not inconsistent with the rule that recovery of attorneys fees and costs are available to a successful indemnity plaintiff. *See Town of Winnsboro v. Wiedeman–Singleton, Inc.*, 307 S.C. 128, 414 S.E.2d 118, 121 (1992) (noting that in an action for equitable indemnification, a plaintiff may recover attorneys' fees and costs); *Addy v. Bolton*, 257 S.C. 28, 183 S.E.2d 708, 709–10 (1971) (same). Such expenses are properly recovered under indemnity, but not in this action. Here, as Myrtle Beach has adamantly and consistently maintained, there is no claim for indemnity; and indeed, the action could not lie, *see infra* at pp. 1062–65.

## C. *Indemnity*

The court now turns to the issue of indemnity. Myrtle Beach has consistently and steadfastly maintained that its action consists solely of a negligence claim and a breach of warranty claim. *See* Second Amended Complaint (pleading only claims for negligence and breach of warranty); Myrtle Beach Pipeline Company's Memorandum in Support of Motion for Partial Summary Judgment, at 7 ("Myrtle Beach alleged two causes of action: negligence and breach of implied warranty of merchantability under ... the UCC."); Myrtle Beach Pipeline Company's Memorandum in Opposition to Defendant's Motion *in Limine* to Limit Plaintiff's Action to One of Indemnity, at 1 ("This is a traditional products liability case and is not an action for indemnity."). Emerson, however, after the cross-motions for partial summary judgment had been filed, moved the court to limit Myrtle Beach's action exclusively to one of indemnity. *See* Emerson Electric Company's Notice of Motion and Motion *in Limine* to limit Plaintiff's Action to One of Indemnity. The court concludes that addressing the issue of indemnity is proper, even though it equally concludes that the breach of implied warranty of merchantability and tort claims cannot prevail. *See Bellevue South Assoc. v. HRH Constr. Corp.*, 78 N.Y.2d 282, 574 N.Y.S.2d 165, 171–73, 579 N.E.2d 195, 201–03, 574 (1991) (addressing implied indemnity claim based on breach of warranty even though the trial court dismissed the underlying warranty claims). Accordingly, the court now examines any basis on behalf of Myrtle Beach for recovery based on indemnity.

Very generally, "indemnity exists whenever the relation between the parties is such that either in law or in equity there is an obligation on one party to indemnify the other, as where one person is exposed to liability by the wrongful act of another in which he does not join." *Stuck v. Pioneer Logging Mach., Inc.*, 279 S.C. 22, 301 S.E.2d 552, 553 (1983) (citing 41 Am.Jur.2d *Indemnity* § 2 (1968); 42 C.J.S. *Indemnity* § 21 (1944)); *see also Restatement of Restitution* § 76 (1937) ("A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct."). Indemnity is a fault-finding theory under which one party shifts the entire loss to another. *Bellevue South*, 574 N.Y.S.2d at 171, 579 N.E.2d at 201; 42 C.J.S. *Indemnity* § 2 (1991). The right to indemnity therefore may be imposed by law or by fact. *See generally Town of Winnsboro v. Wiedeman–Singleton, Inc.*, 303 S.C. 52, 398 S.E.2d 500, 502–03 (Ct.App. 1990), *aff'd*, 307 S.C. 128, 414 S.E.2d 118 (1992); 42 C.J.S. *Indemnity* § 3 (1991). Indemnity imposed by fact is "express indemnity" and is usually based on explicit language in a contractual agreement, *see Town of Winnsboro*, 398 S.E.2d at 502; 42 C.J.S. *Indemnity* § 3 (1991), while indemnity imposed by law is "implied indemnity" and is grounded in equity, *see Town of Winnsboro*, 398 S.E.2d at 503. "Implied indemnity" can be either based on an "implied contract theory" or on "a tort-based right to indemnification."[21] *Peoples' Democratic Republic of*

---

21. The court notes that the concept of indemnity, beginning with its nomenclature, is very far from clear. The courts speak of "implied indemnity" and "equitable indemnity" rather interchangeably. *See and compare Bethlehem Steel Corp. v. Chicago Eastern Corp.*, 863 F.2d 508, 520–24 (7th Cir.1988) (noting that "[t]he classic example of ... *implied* indemnification" is the employee-employer relationship under which the employer is liable for injury to a third party for conduct of his employee) (emphasis added) *with Town of Winnsboro*, 398 S.E.2d at 503 (noting that this master-servant rule under which the master "is vicariously liable for the torts of his servants" is "[a] familiar example of *equitable* indemnity") (emphasis added). These courts use the same example but describe the indemnity respectively as "implied" and "equitable." That these two terms are synonymous is not clear. *See Schneider Nat'l, Inc. v. Holland Hitch Co.*, 843 P.2d 561, 572–74 (Wyo.1992) (stating that there are three types of indemnity: express indemnity, implied contractual indemnity (also termed implied in fact indemnity), and equitable implied indemnity (also termed implied in law indemnity or common law indemnity)). *Schneider* therefore suggests that implied indemnity and equitable indemnity are not the same thing. *Schneider* contains an exhaustive and thorough discussion of indemnity as applied to tort and breach of warranties claims. While the *Schneider* court stated that another term for equitable implied indemnity was common law indemnity, the Supreme

*Yemen v. Goodpasture, Inc.,* 782 F.2d 346, 351 (2d Cir.1986) (citations omitted). Implied indemnity is a restitutionary remedy. *See Schneider Nat'l, Inc. v. Holland Hitch Co.,* 843 P.2d 561, 571 (Wyo.1992); *Dixon v. Chicago & North Western Transp. Co.,* 151 Ill.2d 108, 176 Ill.Dec. 6, 11, 601 N.E.2d 704, 709 (1992); *see also Restatement of Restitution* §§ 1, 96.

### 1. Express Indemnity

[35] Here, there is no express indemnity because there is no clause in the contract providing for express indemnification. No language in the contract even mentions indemnity. *See Hirasa v. Burtner,* 68 Haw. 22, 702 P.2d 772, 772 (1985) (noting that there is no express right to indemnity because "[t]here is nothing in the record showing the existence of an indemnity contract"). Any claim of indemnity therefore must be under an implied theory.

### 2. Implied Indemnity

■ Initially, the court observes that "[t]he circumstances from which an implied right of indemnification has been recognized are ... rather limited." *Hanscome v. Perry,* 75 Md.App. 605, 542 A.2d 421, 426 (1988). An implied right of indemnity, however, may still exist upon consideration of two circumstances: (1) the nature of the relationship between the parties; and (2) the varying degree of culpability between the parties with respect to the loss. *See Peoples' Democratic Republic,* 782 F.2d at 351; *Town of Winnsboro,* 398 S.E.2d at 503 (noting that indemnity may exist "in cases of imputed fault or where some special relationship exists between the first and second parties"); [22] *see also Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Auth.,* 693 F.2d 1, 2 (1st Cir.1982). The court must therefore determine what type of implied indemnity exists here, either implied tort indemnity or implied contractual indemnity.

### a. Implied Tort Indemnity

■ Because the court has concluded that there is no tort action, there can be no implied indemnity based on a tort claim. As the Appellate Court of Illinois observed:

[B]ecause [plaintiff] can have no claim for its economic losses in tort, the claim for indemnification based upon a tort, or fault-finding, theory of recovery is improper.... In actions for breach of warranty under the Uniform Commercial Code, fault is only relevant to the issue of causation in determining if, in fact, a warranty was breached. Instead, [plaintiff] must rely on the Uniform Commercial Code.... Therefore, the suit for breach of warranty against [defendant] is the only indemnifica-

---

Court of Alaska has used the term "common law indemnity" interchangeably with "implied indemnity." *See Providence Washington Ins. v. De-Havilland Aircraft Co. of Canada,* 699 P.2d 355, 357 (Alaska 1985). These are but examples; the case law is rife with differing and conflicting definitions and terms regarding indemnity.

Apart from nomenclatural differences, the courts do not even agree on what elements constitute the same type of indemnity. *Compare Rubenstein v. Ball Bros. (In re New England Fish Co.),* 749 F.2d 1277, 1282 (9th Cir.1984) (stating that the elements of an *equitable* indemnity claim are: "(1) injury to a party and the party's right to assert a cause of action against the defendant; (2) settlement of the injured party's claim by the plaintiff who was legally obligated to pay the claim; and (3) reasonableness of the amount paid in settlement.") (emphasis added) (citations omitted) (applying Washington law) *with Tradewell Group, Inc. v. Mavis,* 71 Wash.App. 120, 857 P.2d 1053, 1056 (1993) (holding that the elements of an *equitable* indemnity claim are "(1) [a] wrongful act or omission by A ... toward

B; (2) such act or omission exposes or involves B in litigation with C....; and (3) C was not connected with the initial transaction or event, viz., the wrongful act or omission of A toward B." ([sic emphasis])) (emphasis added). Both of these cases purport to apply Washington law to an action for equitable indemnity, but the cited elements are not the same. *Compare also Providence Washington,* 699 P.2d at 357 (stating that the elements of an "implied indemnity claim" are "(1) the claimant discharged a legal obligation to a third party, (2) the defendant is also liable to the third person and (3) as between the claimant and defendant, the obligation should be discharged by the latter"). The South Carolina courts have simply noted that the "modern trend" in indemnity "is to look to principles of equity." *Stuck,* 301 S.E.2d at 553.

**22.** In *Town of Winnsboro,* the Court of Appeals of South Carolina noted that even under the concept of equitable indemnity, the party seeking indemnity must be free from any fault in causing the injury. *See Town of Winnsboro,* 398 S.E.2d at 503.

tion claim available to [plaintiff] where the claim is not based on express contractual indemnity.

*Crest Container Corp. v. R.H. Bishop Co.*, 111 Ill.App.3d 1068, 67 Ill.Dec. 727, 732, 445 N.E.2d 19, 24 (1982) (citations omitted). Thus, any right to indemnity must find its genesis in an implied contractual theory.

### b. *Implied Contract Indemnity*

██ As the First Circuit observed regarding contractual indemnity, the "right to indemnification will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility ... or when there is a generally recognized special relationship between the parties." *Araujo*, 693 F.2d at 2–3. The court therefore begins with the premise that not every contract will give rise to a claim for implied indemnity. Here, no "special" or "unique" circumstances bind Myrtle Beach and Emerson. There is nothing striking or peculiar about this contract—it is a simple contract for the sale and purchase of an air eliminator between two sophisticated parties. The courts have uniformly held that this vendor-vendee relationship does not constitute a "special" or "unique" circumstance justifying implied contractual indemnity. *See id.* at 3; *Santisteven v. Dow Chemical Co.*, 506 F.2d 1216, 1219 (9th Cir.1974); *Roy v. Star Chopper Co.*, 442 F.Supp. 1010, 1019 (D.R.I.1977), *aff'd*, 584 F.2d 1124 (1st Cir. 1978), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

The Seventh Circuit likewise denied recovery based on tort or implied indemnity to an aggrieved purchaser in *Bethlehem Steel Corp. v. Chicago Eastern Corp.*, 863 F.2d 508 (7th Cir.1988). In *Bethlehem Steel Corp.*, Chicago Eastern purchased steel from Bethlehem and used the steel in the manufacture of grain bins, which Chicago then sold to its customers. *Id.* at 510. The bins, however, developed cracks; and as a result, Chicago Eastern claimed that it " 'sustained substantial damages for claims for repair and replacement of the defective steel sheeting and damages appurtenant thereto.' " *Id.*, at 518 (quoting complaint of Chicago Eastern).

Chicago Eastern asserted that it was entitled to recover from Bethlehem Steel because Chicago Eastern was obligated to replace the defective products for its own customers. *Id.* at 520. Accordingly, it brought claims for breach of warranty, tort, and indemnity. The Seventh Circuit, affirming the district court, concluded that the economic loss doctrine barred the tort and indemnity claims. *Id.* at 518–24. With respect to the implied indemnity claim, the court noted that Chicago Eastern could not recover under this theory because in essence Chicago Eastern was merely attempting to recover the losses that were shifted to it as a result of its contract with its customers. *Id.* at 521. The losses that Chicago Eastern incurred to its customers were economic losses, *id.* at 522 & n. 16, and for Chicago Eastern to proceed against Bethlehem, it had to find a suitable theory, *id.* at 521. Because the losses Chicago Eastern sought were economic, it could not recover under implied indemnity from Bethlehem Steel because such losses were "readily foreseeable at the time of the sale." *Id.* at 522. The thrust of the discussion was that for the same reasons economic losses were not recoverable in tort, they were not recoverable via implied indemnity.

Hence, there is no basis for Myrtle Beach to recover based upon a theory of implied contractual indemnity. The parties have clearly set forth by their contract language their intent with respect to the responsibilities and risks. The fact that they have specifically addressed these issues is an additional reason for this court to exclude implied indemnification as a theory of recovery. Its possibilities of indemnity exhausted, Myrtle Beach cannot recovery on any type of indemnity claim.

### VI. *CONCLUSION*

This action is governed by South Carolina law because under South Carolina's Uniform Commercial Code choice-of-law provision, the transaction giving rise to this suit bears an "appropriate relation" to the forum state, South Carolina. With respect to the breach of warranty claim, the implied warranty of merchantability was properly disclaimed. Moreover, the contract properly provided for

the sole remedy of repair or replacement; and this exclusive remedy did not fail of its essential purpose. Even if the limited remedy did fail of its essential purpose, exclusion of consequential damages is not unconscionable under these circumstances. Regarding the purported tort claim, the court holds that a tort action cannot be maintained because, boiled down to its bare facts, this suit is nothing more than a breach of warranty action between two commercially sophisticated parties; therefore, Myrtle Beach is relegated solely to its contractual remedies. The issues of Myrtle Beach's possible contributory negligence, assumption of the risk, and failure to avoid consequences are rendered nugatory in light of the above holding. Finally, the court holds that Myrtle Beach cannot maintain an action for indemnity.

**THEREFORE, IT IS ORDERED** that the motion of Emerson for partial summary judgment is granted; and ·

**IT IS FURTHER ORDERED** that the motion of Myrtle Beach for partial summary judgment is denied.

**IT IS SO ORDERED.**